United States Court of Appeals,

Eleventh Circuit.

No. 96-8840.

SIERRA CLUB, The Wilderness Society, Georgia Forestwatch, Inc., The Armuchee Alliance, Rabun County Coalition to Save the Forest, Inc., Friends of Georgia, Inc., Plaintiffs-Appellees,

v.

George G. MARTIN, in his official capacity as Forest Supervisor of the Chattahoochee and Oconee National Forests, Robert C. Joslin, Regional Forester of the United States Forest Service for Region Eight, United States Forest Service, Bert Thomas, Cook Brothers Lumber Company, Parton Lumber Co., Inc., Thrift Brothers Lumber Co., Inc., Defendants-Appellants.

April 29, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:96-CV-926-FMH), Frank M. Hull, Judge.

Before EDMONDSON and BLACK, Circuit Judges, and RONEY, Senior Circuit Judge.

BLACK, Circuit Judge:

The United States Forest Service (Forest Service) and a group of timber contractors, including Bert Thomas, Cook Brothers Lumber Company, Inc., Parton Lumber Company, Inc., and Thrift Brothers Lumber Company, Inc. (collectively Timber Contractors), appeal the issuance of a preliminary injunction on May 8, 1996, ordering the Forest Service to stop all timber cutting and road building activities in seven timber projects in the Chattahoochee and Oconee National Forests in Georgia (collectively Chattahoochee). We reverse.

## I. BACKGROUND

A. *The Litigation*

In 1991, pursuant to the Chattahoochee's land and resource management plan, the Forest Service proposed to sell the rights to

cut timber on seven parcels of land.[1]  The seven parcels—Dunaway Gap, Tibbs Trail, Upper Swallows Creek, Compartment 59, Compartment 05, Big Net, and South Corn Ridge—encompass approximately 2,103 acres out of the 846,000 acres that comprise the Chattahoochee. Each parcel was subject to a separate, formal environmental assessment in which an interdisciplinary team of Forest Service employees, aided by public comment, considered the proposed sale and possible alternatives.[2]  By late 1995, after it was determined that the proposed projects would have no significant environmental impact, all seven projects were approved and opened for bids.

On April 17, 1996, a coalition of national and Georgia-based environmental organizations, including Sierra Club, The Wilderness Society, Georgia Forestwatch, Inc., The Armuchee Alliance, Rabun County Coalition to Save the Forest, Inc., and Friends of Georgia, Inc. (collectively Sierra Club), filed an action challenging the Forest Service's decision to proceed with the timber projects.[3]

---

[1]The Forest Service's administration of the National Forests is governed by the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.,* under which the Forest Service has a duty to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  16 U.S.C. § 1604(a).

[2]The NFMA directs that land and resource management plans be prepared in accordance with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.,* which in turn requires the Forest Service to prepare environmental impact statements.  16 U.S.C. § 1604(g)(1).

[3]Sierra Club (or one of the particular environmental organizations) had previously obtained administrative review of each project.  At the time of the complaint, timber harvesting and road building activity had begun on two of the seven timber projects.  Road building, but no timber harvesting, had begun on a third project.  One timber project had been sold, but not yet implemented.  The remaining three projects had not yet been offered for sale.

The complaint alleged that the decision of the Forest Service to allow timber cutting, logging, clearcutting, road building, and related activities in the seven parcels violated the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1387, the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703-712,[4] the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.,* and their implementing regulations. Sierra Club sought a temporary restraining order, a preliminary injunction, and a permanent injunction. It also sought a declaratory judgment that the Forest Service was in violation of the CWA, MBTA, and the NFMA. On April 19, 1996, in lieu of the district court's granting a temporary restraining order, Sierra

---

[4]In relevant part, the MBTA provides:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or in part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972 and the convention between the United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments concluded November 19, 1976.

16 U.S.C. § 703.

Club and the Forest Service stipulated to a 20-day cessation of all timber-cutting and road-building activities.

B. *The Preliminary Injunction*

On May 8, 1996, the district court ordered the Forest Service to "cause the cessation of all timbercutting and roadbuilding activities," "not permit the commencement or continuation of those activities," and "not offer any of those projects that are unsold" through September 15, 1996. The district court premised the preliminary injunction on a finding that there was a substantial likelihood that Sierra Club would ultimately prevail on the merits of its claim that the Forest Service's actions violated the MBTA, and reserved ruling on Sierra Club's remaining claims. On June 17, 1996, the district court allowed Timber Contractors, who had existing contracts to purchase timber in four of the seven parcels, to intervene. Shortly thereafter, the Forest Service and Timber Contractors instituted the present appeal challenging the district court's order issuing the MBTA-based preliminary injunction.[5]

C. *The MBTA Claim*

The Chattahoochee is home to numerous species of neotropical migratory birds, which typically winter in Mexico or the Caribbean and spend the nesting season in the Chattahoochee. These birds include species designated for protection under the MBTA. Sierra

_____

[5]On September 15, 1996, the MBTA-based preliminary injunction expired. Two days later, the district court issued another preliminary injunction with the same scope that would remain in effect until trial. This second preliminary injunction was based on the Forest Service's violations of the NEPA, the NFMA, the regulations thereunder, and the Chattahoochee's land and resource management plan. The present appeal does not concern this NEPA- and NFMA-based preliminary injunction.

Club asserted that the Forest Service's timber contracts violate the MBTA because they allowed timber cutting during the migratory bird nesting season and that tree cutting during nesting season would directly kill at least 2,000 to 9,000 neotropical migratory birds.[6]  The Forest Service did not dispute that cutting down a tree with an active nest directly killed migratory birds.[7]  The district court held that the Forest Service's actions violated the MBTA because "thousands of migratory birds will be killed directly by cutting down trees with nests and juvenile birds in them." Relying on *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the district court concluded that Sierra Club could obtain injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, for the Forest Service's violation of the MBTA, even though the MBTA does not create a private right of action.[8]  The district court's preliminary injunction extended only through September 15, 1996, the date a Forest Service memorandum identified as the time after which timber cutting would have "no significant effect on the nesting success of migratory

---

[6]Sierra Club (or one of the particular plaintiffs) had raised MBTA issues in the administrative appeal of four of the seven timber projects.

[7]A Forest Service memorandum noted that tree cutting during nesting season would kill migratory birds:  "The loss of individual nests and or birds is an un-avoidable cost of any type of land management activity, whether it be agricultural plowing, mowing, road maintenance, lawn maintenance, clearing land for construction, or cutting trees."

[8]The district court also held that Sierra Club had standing.

birds."[9]

On appeal, the Forest Service asserts that the MBTA is a criminal statute which does not address formal agency action; therefore, notwithstanding the APA's provisions for judicial review, there is no statutory violation for which a remedy would be appropriate. Sierra Club counters that it states a claim under the APA, with the MBTA serving as the predicate law with which the Forest Service's actions are not in compliance.[10]

## II. STANDARD OF REVIEW

We apply a mixed standard when reviewing the grant or denial of a preliminary injunction:

> We review the factfindings of the district court, to the extent they are properly presented on appeal, under the clearly erroneous standard. The district court's application of the law is subject to *de novo* review. We review the district court's grant of injunctive relief for abuse of discretion, meaning we must affirm unless we at least determine that the district has made a "clear error of judgment," or has applied an incorrect legal standard.

*SunAmerica Corp. v. Sun Life Assurance Co. of Can.,* 77 F.3d 1325, 1333 (11th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996) (citations omitted).

## III. DISCUSSION

A. *Mootness*

---

[9]The Forest Service memorandum stated: "Crop Tree Release conducted between September 15 and March 15 will have no significant effect on the nesting success of migratory birds." It appears that the district court interpreted "crop tree release" to mean any and all timber cutting.

[10]In addition, Timber Contractors assert that (1) the district court misinterpreted the MBTA to prohibit timber harvesting activities and (2) the district court abused its discretion in issuing a preliminary injunction. We need not address these arguments because we hold that no violation of the MBTA could occur by any formal action of the Forest Service.

Although the preliminary injunction at issue has already expired, this appeal is not moot to the extent that the injunction represents a continuing controversy capable of repetition, yet evading review. To satisfy the "capable of repetition, yet evading review" exception to mootness, the Supreme Court has required that (1) there be a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration. *Murphy v. Hunt,* 455 U.S. 478, 482-83, 102 S.Ct. 1181, 1183-84, 71 L.Ed.2d 353 (1982); *National Solid Wastes Mgmt. Ass'n v. Alabama Dep't of Envtl. Mgmt.,* 924 F.2d 1001, 1003 (11th Cir.), *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991).

The seasonal nature of migratory bird nesting makes it likely that the Forest Service will face another MBTA injunction at the start of the next nesting season. In spite of the expedited nature of the present appeal, the four-month term of the preliminary injunction was too short to allow for appellate review prior to its expiration. Any future MBTA-based injunction in this lengthy and complex litigation will also be too short to be fully litigated prior to its expiration. As a result, the expired MBTA-based preliminary injunction does not represent a moot controversy.

B. *The Migratory Bird Treaty Act*

Sierra Club claims a right to judicial review of the Forest Service's formal actions under the APA, 5 U.S.C. § 702.[11] As a

_____

[11] 5 U.S.C. § 702 provides, in relevant part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a

procedural statute, the APA does not expand the substantive duties of a federal agency, but merely provides the framework for judicial review of agency action. Accordingly, "[t]here is no right to sue for a violation of the APA in the absence of a "relevant statute' whose violation "forms the legal basis for [the] complaint.' " *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 753 (9th Cir.1991) (quoting *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990)); *see also Preferred Risk Mut. Ins. Co. v. United States,* 86 F.3d 789, 792 (8th Cir.1996) ("[T]he plaintiff must identify a substantive statute or regulation that the agency action had transgressed and establish that the statute or regulation applies to the United States."). Section 706, which provides the scope of review, confirms this understanding. It provides, in relevant part, that a reviewing court shall:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> > (A) arbitrary, capricious, an abuse of discretion, or otherwise *not in accordance with law.*

5 U.S.C. § 706 (emphasis added). An agency's actions could only fail to be "in accordance with law" when that agency's actions are *subject to that law.* The issue then is whether the Forest Service's actions are subject to the MBTA. That is, the MBTA's prohibitions must be addressed to the Forest Service's formal

---

relevant statute, is entitled to judicial review thereof." Section 702 does not itself confer jurisdiction to review agency action. *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977). Jurisdiction stems from 28 U.S.C. § 1331, which provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

actions in order for the Forest Service to be capable of violating the MBTA. *See Chrysler v. Brown,* 441 U.S. 281, 298-301, 99 S.Ct. 1705, 1716-17, 60 L.Ed.2d 208 (1979) (determining whether the Trade Secrets Act, 18 U.S.C. § 1905, addresses formal agency action).

The MBTA, by its plain language, does not subject the federal government to its prohibitions. The MBTA makes it unlawful to "take" or "kill" birds. The penalties for violating its prohibitions are set forth in 16 U.S.C. § 707, which provides that a "person, association, partnership, or corporation" will be guilty of a misdemeanor or felony and subject to fine or imprisonment or both for violating the MBTA.[12] Sierra Club nonetheless asserts that because the prohibitions are stated broadly—that is, "it is unlawful" to "take" or "kill"—it should be unlawful for anybody, including federal agencies, to "take" or "kill" migratory birds.

---

[12]Section 707 provides, in relevant part:

> (a) Except as otherwise provided in this section, any *person, association, partnership, or corporation* who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $500 or be imprisoned not more than six months, or both.

> (b) Whoever, in violation of this subchapter, shall knowingly—

> (1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or

> (2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be fined not more than $2,000 or imprisoned not more than two years, or both.

16 U.S.C. § 707 (emphasis added).

The MBTA, however, should be read as a whole to derive its plain meaning. *See Beecham v. United States,* 511 U.S. 368, 371–72, 114 S.Ct. 1669, 1671, 128 L.Ed.2d 383 (1994). The MBTA is a criminal statute making it unlawful *only* for persons, associations, partnerships, and corporations to "take" or "kill" migratory birds. Moreover, there is no expression of congressional intent which would warrant holding that "person" includes the federal government, thus enabling the United States to prosecute a federal agency, or a federal official acting in his official capacity, for taking or killing birds and destroying nests in violation of the MBTA. Congress has demonstrated that it knows how to subject federal agencies to substantive requirements when it chooses to do so. For example, the term "person" in the Endangered Species Act is defined to include "any officer, employee, agent, department, or instrumentality of the Federal Government." 16 U.S.C. § 1532(13).

The historical context of the MBTA's enactment further demonstrates that it does not apply to the federal government. In 1897, Congress established the National Forest System " "[t]o conserve the water flows, and to furnish a continuous supply of timber for the people.' " *United States v. New Mexico,* 438 U.S. 696, 707, 98 S.Ct. 3012, 3017–18, 57 L.Ed.2d 1052 (1978) (quoting 30 Cong.Rec. 967 (1897)). In light of that purpose, it is difficult to imagine that Congress enacted the MBTA barely twenty years later intending to prohibit the Forest Service from taking or killing a single migratory bird or nest "by any means or in any manner" given that the Forest Service's authorization of logging on federal lands inevitably results in the deaths of individual birds

and destruction of nests. The application of the MBTA to the federal government would have severely impaired the Forest Service's ability to comply with the congressional directive to manage the national forests for timber production.

Congress's subsequent enactment of legislation relating to management of the National Forest System buttresses the conclusion that the MBTA does not apply to the federal government. In the NFMA, Congress expressed its intent that the Forest Service manage forests for multiple uses, including timber production. *See* 16 U.S.C. § 528 ("It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."). Through the NFMA, Congress has prescribed the procedures the Forest Service is to follow and the factors it is to consider in making land management decisions. *See* 16 U.S.C. § 1604. In the process of complying with the NFMA, NEPA, and their implementing regulations, the Forest Service ensures that the impact of land management on migratory bird populations is considered in the context of ensuring viability of native species. 36 C.F.R. § 219.19. The viability regulation requires that, in the context of multiple use planning, habitat be provided within the forest to support a minimum number of reproductive individuals in order to "maintain viable populations of existing native and desired non-native vertebrate species in the planning area." *Id.* The Forest Service's compliance with the viability regulation is subject to judicial review in actions challenging timber sales brought under the APA. *See, e.g., Inland Empire Public Lands*

*Council v. United States Forest Service,* 88 F.3d 754, 759-63 (9th Cir.1996); *Seattle Audubon Soc'y v. Moseley,* 80 F.3d 1401, 1404 (9th Cir.1996).[13] Congress intended that the Forest Service follow the NFMA's regulatory process, rather than the MBTA's criminal prohibitions, in addressing conservation of migratory birds.

## IV. CONCLUSION

The MBTA does not apply to the federal government. As no violation of the MBTA could occur by any formal action of the Forest Service, the Forest Service may not be enjoined under the APA.

REVERSED.

---

[13]Sierra Club has asserted a claim alleging that the Forest Service has failed to comply with the viability regulation, but that claim is not a part of this appeal.