# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 96-1994 and 96-3463
_____

| | | |
|---|---|---|
| Newton County Wildlife Association; Sierra Club; Kent Bonar; Herb Culver; Howard Kuff; Tom McKinney; Jerry Williams, | * * * * * * | |
| Plaintiffs - Appellants, | * * | |
| v. | * * | |
| United States Forest Service; George Rogers; Gregory A. Hatfield; Robert C. Joslin; Lynn C. Neff, | * * * * * | Appeals from the United States District Court for the Eastern District of Arkansas. |
| Defendants - Appellees, | * * | |
| Arkansas Forestry Association, et al., | * * * | |
| Intervenors - Appellees. | * | |

_____

Submitted:  December 12, 1996

Filed:  May 6, 1997
_____

Before FAGG, FLOYD R. GIBSON, and LOKEN, Circuit Judges.
_____


LOKEN, Circuit Judge.


    Newton County Wildlife Association, the Sierra Club, and certain individuals (collectively "the Wildlife Association") sued the United States Forest Service and four of its employees (collectively the "Forest Service") seeking judicial review of four

timber sales in the Ozark National Forest. Parties favoring timber harvesting intervened to support the Forest Service. The Wildlife Association filed sequential motions to preliminarily enjoin the sales as violative of the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. §§ 1271 *et seq.*, and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703 *et seq.* The district court[1] separately denied each motion, and the Wildlife Association separately appealed those orders. We consolidated the appeals and now affirm.

## I. WSRA Issues.

Enacted in 1968, WSRA authorizes Congress or a responsible federal agency to designate river segments that possess "outstandingly remarkable" environmental or cultural values as "components of the national wild and scenic rivers system." 16 U.S.C. §§ 1271, 1274. The responsible federal agency, here the Forest Service, must establish detailed boundaries for each designated segment, including an average of not more than 320 acres of land per mile along both sides of the river. § 1274(b). Under a 1986 amendment, the agency must also prepare a "comprehensive management plan" within three fiscal years after a river segment is designated. The plan "shall address resource protection, development of lands and facilities, user capacities, and other management practices necessary and desirable to achieve the purposes of [WSRA]." § 1274(d)(1).

In 1992, Congress designated segments of six rivers within the Ozark National Forest. The Forest Service's three-year deadline for completing comprehensive management plans for these segments (the "Plans") was September 30, 1995. It is undisputed that the

---

[1]The HONORABLE WILLIAM R. WILSON, JR., United States District Judge for the Eastern District of Arkansas.

Plans were not completed on time. Therefore, the Wildlife Association argues that logging under the four timber sales must be preliminarily enjoined until the agency complies with this statutory mandate.

The Forest Service issued final agency actions approving the four timber sales between August 23, 1994, and September 12, 1995, before the agency's WSRA planning deadline. The Wildlife Association fails to relate this subsequent planning delinquency to judicial review of the timber sales. It relies upon cases in which plans or studies were a statutory precondition to the agency actions under review. See Kleppe v. Sierra Club, 427 U.S. 390, 398-402 (1976) (National Environmental Policy Act), LaFlamme v. F.E.R.C., 852 F.2d 389, 402 (9th Cir. 1988) (Federal Power Act), and Thomas v. Peterson, 753 F.2d 754, 763-64 (9th Cir. 1985) (Endangered Species Act). But WSRA does not mandate completion of § 1274(d)(1) plans before timber sales may be approved. Therefore, the Forest Service did not violate WSRA by approving timber sales during the planning process. That being so, the agency was not required to suspend on-going implementation of the timber sales when it later failed to complete the Plans on time. Absent specific statutory direction, an agency's failure to meet a mandatory time limit does not void subsequent agency action. See Brotherhood of Ry. Carmen v. Pena, 64 F.3d 702, 704 (D.C.Cir. 1995); Kinion v. United States, 8 F.3d 639, 644 (8th Cir. 1993).

Moreover, because the preparation of WSRA Plans was not a precondition to approving the timber sales, a reviewing court may not enjoin or set aside the sales based upon the failure to prepare the Plans. Although the Forest Service may well have WSRA compliance obligations in approving timber sales (an issue not before us), the agency has substantial discretion in deciding procedurally how it will meet those obligations. Cf. Sierra Club

v. Cargill, 11 F.3d 1545, 1548 (10th Cir. 1993). The Forest Service maintains land and resource management plans for each national forest. Those plans "provide for multiple use and sustained yield of [forest] products and services . . . [and] coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1); see 36 C.F.R. Part 219. In 1994, the Forest Service amended its management plan for the Ozark National Forest to take into account the 1992 WSRA designations. In addition, the agency prepared an environmental assessment before approving each of the timber sales in question. Had the Forest Service relied on WSRA Plans as evidencing its compliance with WSRA in approving the timber sales, then we would carefully examine that rationale. But absent a specific statutory directive, we would usurp the agency's procedural autonomy if we compelled it to channel its compliance efforts into a particular planning format.[2]

Finally, a preliminary injunction would be inappropriate in this case because the Forest Service contends that the four timber sales lie outside the boundaries of the WSRA-designated river segments, and the Wildlife Association has not refuted that contention. The district court avoided this issue by ruling that WSRA plans must encompass federally controlled areas that lie outside but *may affect* a designated river segment. On appeal, the Forest Service argues that WSRA plans need only encompass lands lying within a designated segment and therefore its failure to

---

[2]Of course, a party aggrieved by an agency's failure to meet a statutory planning deadline may seek a court order compelling the agency to complete the required plan. See Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986). However, the Wildlife Association has not separately challenged the Forest Service's failure to prepare WSRA Plans. Compare Sierra Club v. Robertson, 28 F.3d 753, 755 (8th Cir. 1994).

timely prepare the Plans cannot affect the timber sales in question. We agree.[3]

Under WSRA, each designated river segment becomes a "component" of the national system. § 1274(a). Following designation, the responsible agency defines the boundaries of "each component," determining how much land adjacent to the river is included in the designation. § 1274(b). At that point, the agency "charged with the administration of each component . . . shall prepare a comprehensive management plan for such river segment to provide for the protection of the river values." § 1274(d)(1). In our view, the plain meaning of that provision limits the planning requirement to the boundaries of the designated river segment, because it is the designated "segment" that becomes a "component" of the national system. This reading is confirmed by § 1281(a) of the Act, which links agency planning and administration to the designated component.[4] Because the Forest Service may limit WSRA plans to lands lying within designated river segments, failure to timely prepare the Plans cannot be a basis for enjoining timber sales on lands lying outside any designated area.

---

[3]On January 14, 1997, while this appeal was pending, the district court issued a more detailed order confirming its contrary interpretation of WSRA. The court lacked jurisdiction over the issue at that time, and its order is hereby vacated.

[4]WSRA § 1283(a) imposes a general obligation on agencies having jurisdiction over lands "which include, border upon, or are adjacent to" a designated river segment to protect the river in accordance with WSRA. But in our view, § 1283(a) does not require agencies managing adjacent federal land to prepare or join in a WSRA plan. It merely instructs their managers to take actions that protect designated rivers. Whether that standard has been met in a particular case is a question of fact. See Wilderness Soc'y v. Tyrrel, 918 F.2d 813, 820 (9th Cir. 1990).

If a plaintiff's legal theory has no likelihood of success on the merits, preliminary injunctive relief must be denied.  <u>See Pottgen v. Missouri State High Sch. Activities Ass'n</u>, 40 F.3d 926, 931 (8th Cir. 1994).  Therefore, the district court properly denied the Wildlife Association's motion to preliminarily enjoin the timber sales because of the Forest Service's failure to complete WSRA Plans.[5]

## II. MBTA Issues.

The Wildlife Association seeks judicial review of the timber sales under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*  As a matter of pleading, APA review is a single "claim for relief" under Fed. R. Civ. P. 8(a).  But the Wildlife Association's amended complaint made this lawsuit unnecessarily convoluted by improperly pleading a separate "Claim for Relief" under each federal statute that, in the Wildlife Association's view, the Forest Service has violated.  Thus, its Sixth Claim for Relief alleged that "approval of the Buffalo River Timber Sales violates the Migratory Bird Treaty Act (16 U.S.C. § 703 *et seq.*)."  After the district court denied preliminary injunctive relief under WSRA, the Wildlife Association filed a second motion for a preliminary injunction, seeking to enjoin implementation of the timber sales on the ground that the Forest Service failed to obtain an MBTA "special purpose" permit from the United States Fish and Wildlife

---

[5]The Wildlife Association's contention that the district court did not make the findings of fact and conclusions of law required by Fed. R. Civ. P. 52(a) is without merit.  Under Rule 52(a), the district court must "sufficiently inform the [appellate] court of the basis" of its decision.  <u>Scoggins v. Board of Educ.</u>, 853 F.2d 1472, 1477 (8th Cir. 1988).  Here, the court ruled that the failure to complete WSRA Plans did not warrant enjoining performance of the timber sale contracts.  Rule 52(a) requires no more.

Service.  The district court denied the motion, concluding that it does not have jurisdiction over a separate MBTA claim.  One week later, the court granted the Forest Service partial summary judgment and dismissed the Wildlife Association's Sixth Claim for Relief.  The Wildlife Association appeals both orders.

The Wildlife Association argues that the APA confers jurisdiction to grant injunctive relief "under the MBTA."  The district court correctly concluded that the Wildlife Association's MBTA claim is barred by Defenders of Wildlife v. Administrator, E.P.A., 882 F.2d 1294 (8th Cir. 1989).  In Defenders, plaintiffs alleged that the agency violated MBTA when it terminated a proceeding commenced under another statute, known as FIFRA, to cancel strychnine pesticide registrations.  After noting that MBTA does not create private rights of action, we rejected plaintiffs' assertion that the APA conferred jurisdiction to consider this claim.  "Although the APA may state the scope of review, 5 U.S.C. § 706, FIFRA still provides the mechanism for obtaining judicial review.  Thus, the APA does not operate separately from FIFRA, but instead as a part of FIFRA."  882 F.2d at 1302-03.  In this case, the Wildlife Association's Sixth Claim for Relief fails for the same reason.  The Forest Service approved the timber sales acting under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq.  Jurisdiction to review the sales is conferred by NFMA, not the APA.  See Preferred Risk Mut. Ins. Co. v. United States, 86 F.3d 789, 792 (8th Cir. 1996).

This case differs from Defenders in one important respect.  In Defenders, EPA declined to take pesticide registration action under the governing statute, FIFRA.  Plaintiffs did not seek review of that failure to act under FIFRA, no doubt because such a challenge would be contrary to the general principle that "an agency's

decision not to take enforcement action [is] presumed immune from judicial review under [5 U.S.C.] § 701(a)(2)." Heckler v. Chaney, 470 U.S. 821, 832 (1985), followed in Lincoln v. Vigil, 508 U.S. 182, 192-93 (1993).  Here, on the other hand, the timber sales are final agency actions subject to judicial review under NFMA.  One issue in conducting that review is whether the Forest Service's actions under NFMA are arbitrary, capricious, or contrary to law *because the agency ignored or violated its obligations under MBTA.* The district court did not address this issue in denying preliminary injunctive relief, perhaps because the Wildlife Association did not squarely raise it.  But the issue has been raised on appeal and deserves our attention.

Congress passed MBTA in 1918 to implement a treaty between the United States and Great Britain protecting migratory birds in North America.  See generally Missouri v. Holland, 252 U.S. 416 (1920). MBTA makes it unlawful, "except as permitted by regulations," to pursue, hunt, take, capture, kill, possess, sell, barter, purchase, ship, export, import, transport, or carry specified migratory birds or their nests or eggs.  16 U.S.C. §§ 703, 704.  MBTA is a criminal statute:  "any person, association, partnership, or corporation" who violates MBTA or its regulations is guilty of a misdemeanor and may be fined up to $500 and imprisoned for up to six months; those who knowingly take or sell migratory birds in violation of the Act are guilty of a felony.  16 U.S.C. § 707(a), (b).

In this case, the Wildlife Association alleges, and the Forest Service concedes, that logging under the timber sales will disrupt nesting migratory birds, killing some.  The Wildlife Association argues that the sales therefore violate MBTA's absolute prohibition against killing or taking nesting birds unless the Forest Service

obtains a permit under the Fish and Wildlife Service regulations implementing MBTA. We disagree.

Initially, we note that MBTA's plain language prohibits conduct directed at migratory birds -- "pursue, hunt, take, capture, kill, possess," and so forth. The government argues that the statute imposes "strict liability" on violators, except for felony violations, which under a recent amendment must be done "knowingly." Strict liability may be appropriate when dealing with hunters and poachers. But it would stretch this 1918 statute far beyond the bounds of reason to construe it as an absolute criminal prohibition on conduct, such as timber harvesting, that *indirectly* results in the death of migratory birds. Thus, we agree with the Ninth Circuit that the ambiguous terms "take" and "kill" in 16 U.S.C. § 703 mean "physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918." Seattle Audubon Soc'y v. Evans, 952 F.2d 297, 302 (9th Cir. 1991); accord Mahler v. United States Forest Serv., 927 F. Supp. 1559, 1573-74 (S.D. Ind. 1996); Citizens Interested in Bull Run, Inc. v. Edrington, 781 F. Supp. 1502, 1509-10 (D. Or. 1991).

In addition, we agree with the Forest Service that MBTA does not appear to apply to the actions of federal government agencies. MBTA sanctions apply to "any person, association, partnership, or corporation," 16 U.S.C. § 707(a). "Since, in common usage, the term 'person' does not include the sovereign, statutes employing the phrase are ordinarily construed to exclude it." United States v. Cooper Corp., 312 U.S. 600, 604 (1941); see Will v. Michigan Dept. of State Police, 491 U.S. 58, 64 (1989). The Wildlife Association argues that MBTA must apply to federal agencies if our Nation is to meet its obligations under the 1916 treaty. But the

government's duty to obey the treaty arises from the treaty itself; the statute extends that duty to private persons. This is confirmed by Article VIII of the treaty: "The High Contracting Powers *agree themselves to take*, or propose to their respective appropriate law-making bodies, the necessary measures for insuring the execution of the present Convention." CONVENTION BETWEEN THE UNITED STATES & GREAT BRITAIN FOR THE PROTECTION OF MIGRATORY BIRDS, Art. VIII, 39 Stat. 1702, 1704 (1916) (emphasis added).

Our conclusions about the apparent scope of MBTA are necessarily tentative because we lack the views of the Fish and Wildlife Service, the agency charged with administering and enforcing that statute. This regulatory vacuum exposes the most serious flaw in the Wildlife Association's claim that the timber sales violate MBTA. The Wildlife Association argues that the Forest Service must apply for and obtain the special purpose permit described in the Fish and Wildlife Service's MBTA regulations. But the permitting regulation, though potentially broad, does not on its face apply to the Forest Service or other federal agencies. See 50 C.F.R. § 21.27. The Wildlife Association has no authority suggesting that the Fish and Wildlife Service generally requires the Forest Service to obtain this permit for its timber sales. Nor has the Fish and Wildlife Service expressed that view in this proceeding, before either the agency or the reviewing courts, for example, by seeking to intervene or submitting a brief *amicus curiae*.

In substance, the Wildlife Association urges this court to enjoin timber sales because the Forest Service did not obtain a permit that the Fish and Wildlife Service does not require. Thus, the Wildlife Association's real dispute is with the Fish and Wildlife Service, for that agency's failure to enforce MBTA against

Forest Service timber sales in the manner the Wildlife Association desires.  But the Wildlife Association has not asserted that claim, which would run afoul of the <u>Heckler v. Chaney</u> presumption that agency failure to take enforcement action is not subject to APA review.  Whatever the reason the Fish and Wildlife Service does not require the Forest Service to obtain MBTA permits, this enforcement policy is committed to agency discretion and is not a proper subject of judicial review.

For the foregoing reasons, the district court's orders of April 8, 1996, and July 29, 1996, denying the Wildlife Association's motions for a preliminary injunction are affirmed. Because the reasons for denying injunctive relief under MBTA are inextricably intertwined with the district court's August 5, 1996, order dismissing the Wildlife Association's Sixth Claim for Relief, we have jurisdiction to consider the Wildlife Association's interlocutory appeal of that order, and it too is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-