The HUMANE SOCIETY OF
THE UNITED STATES,
et al., Appellees,

v.

Dan GLICKMAN, Secretary, U.S.
Department of Agriculture,
et al., Appellants.

No. 99–5309.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 2000.

Decided July 18, 2000.

James C. Kilbourne, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, and Andrew Mergen, Attorney.

Jonathan R. Lovvorn argued the cause for appellees. With him on the brief was Katherine A. Meyer.

Before: EDWARDS, Chief Judge, RANDOLPH and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The "International Convention for the Protection of Migratory Birds," 39 Stat. 1702 (1916), between the United States and Great Britain (acting for Canada) sought to preserve, in the words of Justice Holmes, "a national interest of very nearly the first magnitude," *Missouri v. Holland,* 252 U.S. 416, 435, 40 S.Ct. 382, 64 L.Ed. 641 (1920). The Treaty "recited that many species of birds in their annual migrations traversed certain parts of the United States and of Canada, that they were of great value as a source of food and in destroying insects injurious to vegetation, but were in danger of extermination through lack of adequate protection." *Id.* at 431, 40 S.Ct. 382. Legislation implementing the Treaty—the Migratory Bird Treaty Act of 1918—"prohibited the killing, capturing or selling any of the migratory birds included in the terms of the treaty except as permitted by regulations" now administered by the Department of the Interior.[1] 252 U.S. at 431, 40 S.Ct. 382. In this appeal from the district court's order enjoining the Department of Agriculture from violating the statute, the question is whether the Migratory Bird Treaty Act prohibits federal agencies from killing or taking migratory birds without a permit from the Interior Department.

I

At the center of the controversy is the Canada goose—*Branta canadensis.* With its black-stockinged neck and head and distinctive white cheek patch, its loud resonant honking calls, and its V-shaped flight formations, the Canada goose is a familiar sight throughout most of North America. *See* FRANK C. BELLROSE, DUCKS, GEESE AND SWANS OF NORTH AMERICA 142 (3d ed.1980). The Mid–Atlantic population of Canada geese, one of eleven recognized races, winters in the coastal areas of Virginia, Maryland, Delaware, and New Jersey, and returns in the spring to the tundra zone of the Ungava Peninsula in Quebec, its traditional summer breeding grounds. *See id.* at 144–45. In recent years, however, large flocks of Canada geese have stopped migrating, preferring to breed, nest and rear their young in the coastal states of the middle Atlantic region. The Commonwealth of Virginia has become a host to many of these full-time residents. In 1991, an estimated 66,169 Canada geese lived year round in Virginia. By 1998 Virginia's resident goose population had quadrupled to 254,000. *See* Wildlife Services, Animal and Plant Health Inspection Service, U.S. Dep't of Agriculture, *Environmental Assessment for the Management of conflicts associated with non-migratory (resident) Canada geese, migratory Canada geese, and urban/suburban ducks in the Commonwealth of Virginia* § 2.1, at 6 (Mar. 30, 1999) (*"Environmental Assessment"*). In the same year, only 70,000 migratory Canada geese wintered over in Virginia, *see id.* tbl.5, at 18, a number not much larger than the migratory population in the 1970s, *see* BELLROSE, *supra,* at 148.

Residential owners, farmers, government officials and many others are deeply concerned about the exploding population of Canada geese. Browsing by Virginia's resident geese has reduced state-wide yields of cereal grains, peanuts, soybeans and corn. Goose droppings have spoiled water quality around beaches and wetlands, and interfered with the enjoyment of parks and ball fields. The geese have damaged gardens, lawns and golf courses. Their fecal deposits threaten to contaminate drinking water supplies. *See Environmental Assessment* § 2.1.1, at 6; § 2.1.2.1, at 7; § 2.1.3.1, at 11; § 2.1.4, at 12. And they pose a hazard to aircraft. Resident geese are found at most of Virgi-

---

1. The Act originally delegated regulatory authority to the Department of Agriculture. The 1939 Reorganization Plan No. II, § 4(f), 53 Stat. 1433, transferred the functions of the Secretary of Agriculture relating to the conservation of wildlife, game, and migratory birds to the Secretary of the Interior.

nia's airports and military bases. In 1995, a passenger jet hit ten Canada geese at Dulles International Airport, causing $1.7 million of wing and engine damage. *See id.* § 2.1.2.5, at 10. Collisions have also occurred at other Virginia airports. And "Langley Air Force Base and Norfolk Naval Air Station have altered, delayed, aborted, and ceased flight operations because of Canada geese on their field." *Id.*[2]

In response to these problems and others, the Department of Agriculture, through its Animal Health and Inspection Service's Wildlife Services division, instituted an "Integrated Goose Management Program" in conjunction with Virginia state agencies. The plan called for various measures such as harassment, biological control, habitat alteration, repellents, nest and egg destruction, and capture and killing. The killings were to take place during the "summer molt"—between mid-June and late-July—when the resident geese cannot fly (the migratory geese are in Canada at this time of year). An Environmental Assessment, issued on January 29, 1997, reflected the Interior Department's longstanding position that the Migratory Bird Treaty Act restricted not only private parties and states, but also federal agencies. Hence a "federal Migratory Bird Depredation Permit ... would be required and obtained for the proposed action." Animal Damage Control, Animal and Plant Health Inspection Service, U.S. Dep't of Agriculture, *Environmental Assessment for the Management of conflicts associated with nonmigratory (resident) Canada geese and urban/suburban mallard ducks in the State of Virginia* 22 (Jan. 29, 1997). Interior's Fish and Wildlife Service (FWS) is authorized to issue such depredation permits for migratory birds that "bec[o]me seriously injurious to the agricultural or other interests in any particular community." International

Convention for the Protection of Migratory Birds, art. VII, 39 Stat. 1702, 1704 (1916) ("International Convention"), *referenced in* 16 U.S.C. § 704; *see also* 50 C.F.R. pt. 21.

In 1997, the Director of FWS issued a memorandum to regional directors stating that federal agencies no longer needed to obtain a permit before taking or killing migratory birds. The Humane Society of the United States, Citizens for the Preservation of Wildlife, the Animal Protection Institute, and three individuals thereupon filed suit against the Secretaries of Agriculture and Interior and other officials in those departments seeking to enjoin implementation of the Goose Management Plan. The district court ruled that § 703 of the Migratory Bird Treaty Act restricted federal agencies. The court therefore enjoined the defendants "from conducting the Canada Goose Plan until such time as they shall obtain valid permits to do so pursuant to the" Act. *Humane Soc'y v. Glickman,* No. 98CV–1510, memorandum opinion at 21–22 (D.D.C. July 6, 1999).

## II

■ Although Virginia's Canada geese are year-long residents, they are members of a species that migrates and therefore fall within the category of "migratory birds" protected by the 1916 Treaty and the Act. *See* 50 C.F.R. § 10.13. Protected from whom? The district court thought § 703 of the Act gave the answer—from everyone in the United States, including federal agencies. The provision reads:

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase,

2. Resident Canada geese and the problems they cause are not confined to the east coast. The Washington Post reported that the Agriculture Department, having obtained a permit from FWS, is rounding up resident Canada geese and killing them in twelve counties surrounding Puget Sound in Washington State. *See* Ben White, *Honk if You Hate Goose Droppings,* WASH. POST, June 29, 2000, at A29.

deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or in part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702)....

16 U.S.C. § 703. As legislation goes, § 703 contains broad and unqualified language—"at any time," "by any means," "in any manner," "any migratory bird," "any part, nest, or egg of any such bird," "any product ... comprised in whole or part, of any such bird." The one exception to the prohibition is in the opening clause—"Unless and except as permitted by regulations made as hereinafter provided in this subchapter...." For migratory game birds, of which the Canada goose is one, the exception gives the Interior Department authority to regulate hunting seasons and bag limits. Article II of the Treaty itself required a closed season—no hunting of these birds—between March 10 and September 1, the typical period when the birds breed, molt and raise their young. In addition to issuing hunting regulations, *see, e.g.,* 50 C.F.R. pt. 20; *id.* § 20.105, the Secretary of the Interior may issue permits for killing Canada geese and other migratory birds if this is shown to be "compatible with the terms of the [Migratory Bird] conventions."[3] 16 U.S.C. § 704. As we have said, Article VII of the Treaty contemplated that permits allowing the killing of migratory birds would be available in "extraordinary conditions" when the birds have "become seriously injurious to the agricultural or other interests in any particular community," International Convention, art. VII, 39 Stat. 1704.

As § 703 is written, what matters is whether someone has killed or is attempting to kill or capture or take a protected bird, without a permit and outside of any designated hunting season. Nothing in § 703 turns on the identity of the perpetrator. There is no exemption in § 703 for farmers, or golf course superintendents, or ornithologists, or airport officials, or state officers, or federal agencies. In that respect, § 703 is rather like the statute in *United States v. Arizona,* 295 U.S. 174, 183–84, 55 S.Ct. 666, 79 L.Ed. 1371 (1935), which also framed its prohibition in terms of the forbidden acts without mentioning the identity of the transgressor: there shall be no "construction of any bridge, dam, dike or causeway over or in any port, roadstead, haven, harbor, canal, navigable river or other navigable water of the United States until the consent of Congress shall have been obtained and until the plans shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War." *Id.* at 184, 55 S.Ct. 666 (citing 33 U.S.C. § 401). The Court viewed the provision as restricting not only private parties, but also state and federal agencies, so that the Secretary of the Interior could not order the building of a dam without congressional authorization. "The plaintiff maintains that the restrictions so imposed apply only to work undertaken by private parties. But no such intention is expressed, and we are of opinion that none is implied. The measures adopted for the enforcement of the prescribed rule are in general terms and purport to be applicable to all. No valid reason has been or can be suggested why they should apply to private persons and

---

**3.** "Subject to the provisions and in order to carry out the purposes of the conventions ... the Secretary of the Interior is authorized and directed, from time to time ... to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture, [or] killing ... of any such bird ... and to adopt suitable regulations permitting and governing the same...."

not to federal and state officers." *Id.* at 184, 55 S.Ct. 666.

■ The defendants here, in order to promote their position that federal agencies are exempt from § 703, seek to introduce structural ambiguity into the Act, citing the criminal penalty provision of § 707(a):

> Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $15,000 or be imprisoned not more than six months, or both.

16 U.S.C. § 707(a). Federal agencies, they say, cannot be considered "persons" who may be held criminally liable for violating the Act or the Treaty. (They do not discuss whether federal officers carrying out the extermination of migratory birds could be considered "persons.") The defendants' reading of § 707(a) gains support from the canon that the term "person" does not ordinarily include the sovereign. *See United States v. Cooper Corp.*, 312 U.S. 600, 604, 61 S.Ct. 742, 85 L.Ed. 1071 (1941).[4] And so we are willing to assume that the criminal enforcement provision could not be used against federal agencies. From this the defendants reason that Congress could not have intended to have § 703 restrict federal agencies because there would have been no means to enforce the restrictions; at the time of its enactment, they tell us, there was no provision in the Migratory Bird Treaty Act for injunctive relief.[5]

The argument goes nowhere. Even without a specific review provision, there still could have been a suit against the appropriate federal officer for injunctive relief to enforce § 703. *Missouri v. Holland,* for instance, was a "bill in equity brought by the State of Missouri· to prevent a game warden of the United States from attempting to enforce the Migratory Bird Treaty Act." 252 U.S. at 430, 40 S.Ct. 382. The Supreme Court had already recognized the "equity injunction as a method for review of administrative action" in *Noble v. Union River Logging R.R.*, 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893), affirming an injunction against the Secretary of the Interior although the underlying statute contained no provision for judicial review. 4 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 23:6, at 149 (2d ed.1983). By 1903 the Court had determined that the "acts of all of [an agency's officers] must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 108, 23 ·S.Ct. 33, 47 L.Ed. 90 (1902); *see also* U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 97 (1947); RICHARD H. FALLON ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1015–17 (4th ed.1996). Defendants are, in short, quite mistaken in supposing that § 703 could not be enforced against federal agencies except through the criminal provision contained in § 707(a).

■ Defendants' argument, and our assumption, that federal agencies are not "persons" within § 707(a)'s meaning therefore does not lead to the conclusion that Congress meant to exempt federal agen-

---

4. The canon applies not only to the federal government but also to the States. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* — U.S. —, 120 S.Ct. 1858, — L.Ed.2d — (2000). Yet defendants maintain that States and state agencies are subject to the Act's restrictions.

5. Today, the Administrative Procedure Act, 5 U.S.C. § 702, authorizes suits in federal courts naming the United States as a defendant and specifying in any injunctive decree the federal officers "personally responsible" for compliance.

cies from § 703. Indeed it would be odd if they were exempt. The Migratory Bird Treaty Act implements the Treaty of 1916. Treaties are undertakings between nations; the terms of a treaty bind the contracting powers. After ratification of the Treaty, President Woodrow Wilson affixed his signature to it and made it public, "to the end that the same and every article and clause thereof may be observed and fulfilled with good faith *by the United States* and the citizens thereof." 39 Stat. 1705 (italics added). If one year later, in 1917, Canadian authorities had started slaughtering eider ducks, no one would doubt that Canada would be guilty of violating Article IV of the Treaty, which protects these ducks. If some agency of the federal government did the same in Alaska, the United States too would be in violation of the Treaty. There is no reason to treat the Act differently from the Treaty since the legislation was meant to "give effect to the convention between the United States and Great Britain for the protection of migratory birds," ch. 128, 40 Stat. 755, 755 (1918). The Act incorporates the terms of the Treaty in determining, among other things, two critical issues: which birds are covered, *see* 16 U.S.C. § 703, and under what conditions the Interior Department may issue exemptions, *see id.* § 704. *See also id.* §§ 708, 709a, 712 (all referencing the conventions). In short, the fact that the Act enforced a treaty between our country and Canada reinforces our conclusion that the broad language of § 703 applies to actions of the federal government.

Canada too understood that legislation implementing the Treaty applied to the sovereign. If Canadian authorities kill migratory birds without a permit they violate not only the Treaty, but also Canada's Migratory Birds Convention Act. That

Act "is binding on Her Majesty in right of Canada or a province."[6] R.S.C., ch. 22, § 3 (1994). The Canadian Act, like its American counterpart, derives from Article VIII of the Treaty, which obligated both Contracting Powers to "propose to their respective appropriate law-making bodies the necessary measures for insuring the execution of the present Convention." International Convention, art. VIII, 39 Stat. 1704. That Canada treated this joint obligation to mean that implementing legislation would be binding on the sovereign indicates still further that § 703 restricts the actions of federal agencies in this country.

This too had been the longstanding conclusion of the Department of the Interior, which until 1997 had "historically interpreted the provisions of the MBTA as applying to actions of FWS employees themselves." Letter from Frank K. Richardson, Solicitor, U.S. Dep't of the Interior, to the Secretary of the Interior at 3 (May 31, 1985); *see also* 50 C.F.R. § 21.12. Although FWS has now changed its mind, neither Interior nor Agriculture asks us to defer to their interpretation of the Act, and for good reason. The Agriculture Department does not administer the Act and so its view of § 703's meaning is entitled to no special respect. For its part, the Interior Department conceded that the 1997 FWS change of heart, in a letter to regional offices, was not "a policy call on the part of the Service," nor "a 'filling in' of the 'gaps' in the" statute. Federal Defendants' Opposition to Plaintiff's Emergency Motion to Compel Defendants to File an Administrative Record at 2 (June 4, 1999). *Christensen v. Harris County,* —— U.S. ——, ——, 120 S.Ct. 1655, 1657, 146 L.Ed.2d 621 (2000), holds that: "Interpretations such as those in opinion letters—like interpretations contained in policy

---

6. *See also* R.S.C., ch. 22, § 6:
   Exemptions for law enforcement activities
   (5) For the purpose of investigations and other law enforcement activities under this Act, the Minister may, on any terms and conditions the Minister considers neces-

sary, exempt game officers who are carrying out duties or functions under this Act, and persons acting under their direction and control, from the application of any provisions of this Act or the regulations.

statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *See also EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).

For many of the reasons we have mentioned, we disagree with the "tentative conclusion" in *Newton County Wildlife Ass'n v. United States Forest Service*, 113 F.3d 110, 115 (8th Cir.1997), and the holding in *Sierra Club v. Martin*, 110 F.3d 1551, 1555 (11th Cir.1997), that § 703 does not apply to federal agencies. Both opinions rest on the mistaken idea that in 1918, § 703 could be enforced only through the criminal penalty provision in § 707(a). The *Martin* opinion adds the thought that Congress could not have wanted the Act to apply to the Forest Service in the early 1900s because whenever it cut trees it might be destroying migratory birds or their nests, in violation of the Act. *See* 110 F.3d at 1555. The *Martin* court's assumption that timber harvesting could violate the Migratory Bird Treaty Act is not shared by others. The Eighth Circuit in *Newton County*, following the lead of the Ninth Circuit in *Seattle Audubon Society v. Evans*, 952 F.2d 297, 302 (1991), held that § 703 does not prohibit "conduct, such as timber harvesting, that indirectly results in the death of migratory birds." 113

F.3d at 114. Even if the *Martin* court were correct about timber harvesting, its observation about the Forest Service ignores the facts that it was not until 1997 that the Interior Department asserted immunity for federal agencies; that before then the Fish and Wildlife Service interpreted the Act to apply to all federal agencies; that during the pre–1997 period the Forest Service, like other federal agencies, could obtain permits; and that—as the documents submitted in this case show—it was the *Martin* case and other pending litigation that "spurred" Interior to adopt the "new" interpretation.[7]

We conclude that because the Wildlife Services division of the Department of Agriculture did not obtain a permit from the Department of the Interior, its implementation of the Integrated Goose Management Plan by taking and killing Canada Geese violates § 703 of the Migratory Bird Treaty Act.

*Affirmed.*

---

**7.** Nor did the *Martin* court acknowledge the Supreme Court's dictum in *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), that the Act applies to federal agencies.