**CITIZENS INTERESTED IN BULL RUN, INC., an Oregon nonprofit corporation and Frank Gearhart, an individual and citizen of the State of Oregon, Plaintiffs,**

v.

**Michael S. EDRINGTON, in his individual capacity and as supervisor of the Mt. Hood National Forest; F. Dale Robertson, in his individual capacity and as Chief of the Forest Service; and the United States of America, Defendants,**

**Brazier Forest Products of Oregon, Inc., Intervenor.**

**Civ. No. 90–844–MA.**

United States District Court, D. Oregon.

June 20, 1991.

C. Peter Sorenson, William Carpenter, Sorenson Law Office, Eugene, Or., for plaintiffs.

Thomas Lee, Asst. U.S. Atty., Arno Reifenberg, Jocelyn Somers, Office of General Counsel, U.S. Dist. Atty., Portland, Or., for defendants.

## OPINION

MARSH, District Judge.

Plaintiffs filed this action challenging the U.S. Forest Service's proposed Quiver Timber Sale in the Mt. Hood National Forest. Defendants and intervenors move for summary judgment against all claims. Plaintiffs concede to dismissal of their sixteenth claim, and move for partial summary judgment as to their claims against Michael Edrington for violations of NEPA and the APA. In addition, plaintiffs object to the summary judgment process and seek additional discovery.[1] For the reasons that fol-

---

1. Plaintiffs object to this court hearing summary judgment motions while discovery has

low, defendants' motion for summary judgment is granted as to all claims, intervenor's motion for summary judgment is moot, and plaintiff's motion for partial summary judgment and requests for additional discovery are denied.

## STANDARDS

Summary judgment is appropriate if the court finds that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). There is no genuine issue of material fact where the nonmoving party fails "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989).

All reasonable doubts as to the existence of genuine issues of fact must be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir.1989). Where different ultimate inferences can be drawn, summary judgment is inappropriate. *Sankovich v. Insurance Company of North America*, 638 F.2d 136, 140 (9th Cir.1981).

## DISCUSSION

Plaintiff, Citizens Interested in Bull Run, Inc. (CIIBRI), is a nonprofit corporation. Plaintiff Frank Gearhart is the president of CIIBRI and a resident of Gresham, Oregon. Plaintiffs seek to enjoin defendants from carrying out the proposed sale of 46 acres of timber in a unit of the Quiver Project Area in the Mt. Hood National Forest in eighteen different claims which fall under seven different legal theories. For the purpose of this motion, I am assuming, without deciding, that plaintiffs have standing to bring claims under the federal Acts.[2]

1. *Failure to Comply with BRMA § 2(a)*

■ Plaintiffs first assert that defendants' proposed sale should be enjoined until such time as defendants are ordered to promulgate water quality regulations on the subdrainages of the Little Sandy River in the Bull Run Watershed Management Unit. Specifically, plaintiffs allege that defendants' failure to promulgate water quality regulations for this area violates section 2(a) of the Bull Run Management Act (BRMA), P.L. 95–200 (1977) and the Administrative Procedure Act (APA). *See* Amended Complaint, Claims 1–3. Plaintiffs further contend that the regulations which were promulgated have a significant adverse effect on compliance with water quality standards in violation of BRMA § 2(a) and Section 318 of the Department of Interior and Related Appropriations Act for Fiscal Year 1990, Public Law No. 101–121, 103 Stat. 701 (1989) (§ 318). Amended Complaint, Claims 4 and 5. Next, plaintiffs contend that defendants violated the APA and § 318 by failing to consider the cumulative effect of the Quiver timber sale on the water quality standards, as required by § 2(a) of the BRMA. Amended Complaint, Claims 6 and 7.

The Bull Run Management Act was enacted in November of 1977 for the purpose of ensuring the continued production of "pure clear raw potable water" from the Bull Run Forest Reserve. *See* P.L. 95–200, "Preamble." The Act created a special resources management unit within the Mount Hood National Forest, comprising approximately 95,382 aces entitled "Bull Run Watershed Management Unit, Mount Hood National Forest." *Id.* Management of the

been stayed. Plaintiffs contend that they have been precluded from deposing agency experts and from conducting discovery to challenge the agency's administrative record.

**2.** Although I find that I need not reach the issue of standing in this case, I have doubts regarding plaintiffs' claims of standing, particularly inso- far as they relate to water quality standards for an area closed to the public and located outside of the Bull Run Drainage, in light of the Supreme Court's recent decision in *Lujan v. National Wildlife Federation*, —— U.S. ——, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990).

unit is defined under § 2. Subsection 2(a) provides as follows:

"The unit and the renewable resources therein, shall be administered as a watershed by the Secretary of Agriculture in accordance with the laws, rules, and regulations applicable to National Forest System lands except to the extent that any management plan or practice is found by the Secretary to have a significant adverse effect on compliance with the water quality standards referred to in section 2(b) hereof or on the quantity of the water produced thereon for the use of the city (and the Secretary shall take into consideration the cumulative effect of individually insignificant degradations), in which case, and notwithstanding any other provision of law, the management plan and all relevant leases, permits ... or other rights or authorizations issued pursuant thereto shall forthwith be altered by the Secretary to eliminate such adverse effect by application of different techniques or prohibitions ..."

Subsection 2(b) provides that the policies set forth in subsection (a) shall be attained through land management plans, monitoring systems, scientific research, and public participation. Subsections 2(c) through (e) provide that the Secretary must cooperate and negotiate with city officials regarding water quality and quantity standards, programs, boundary adjustments and operational activities.

Subsection 3(e) provides that any challenge to an action under this Act "shall not be sustained by any court except upon a showing or [sic] arbitrary, unreasonable, capricious, or illegal action or an absence of substantial good faith compliance with the procedural provisions hereof substantially prejudicing the rights of an interested party."

It is undisputed that the Quiver Timber Sale is located outside of the Bull Run Watershed. In addition, the base period water quality standards referred to in § 2(a) refer to water quality assessments taken at five stations within the Bull Run

Watershed. Administrative Record, Part I, pp. 30, 40, 312–324. There is nothing in the Congressional mandate to indicate that water quality standards applicable to the Bull Run watershed could or should be applied to areas beyond the watershed, such as the Little Sandy River. The Administrative Record indicates that defendants adhered to the watershed boundary restrictions. *See* AR, Vol. III at p. 764 n. 6 and n. 8. Accordingly, I find that plaintiffs' allegations regarding defendants' failure to comply with § 2(a) must fail as a matter of law.

In addition, in my review of the administrative record, I find that defendants have considered the direct, indirect and cumulative effects of the Quiver Timber Sale on water quality in the Little Sandy River. In an effort to comply with the Mount Hood National Forest Timber Management Plan of 1978 and Section 318 of the 1990 Appropriations Act, Mr. Edrington issued a Decision Notice and Finding of No Significant Impact for the Quiver Timber Project. *See* Administrative Record, Part III, pp. 739–743. The decision indicates that the proposed sale would "protect water quality in the Little Sandy and it's tributaries. Forested streamside riparian area buffers will prevent erosion and protect stream temperatures to ensure water quality and fish habitat is not degraded." *Id.*, at 739; *see also* p. 740 n. 3, 5 & 7; p. 742 n. 2, 5 & 6; Quiver Project Area, Environmental Assessment, AR Vol. III, p. 749 n. 1, 3, p. 750 n. 5; and the Quiver Project Area Analysis File, AR Vol. III, p. 2–1 through 2–4 (discussing water quality mitigation measures, including water monitoring in the sale area, riparian buffers and suspended logging systems) and AR at p. 1275 (description of inventory monitoring for Quiver sale which include plans to measure physical riparian characteristics such as stream shade, bank stability, vegetative coverage and in-channel debris). The EA acknowledges the possibility that the Little Sandy area may be a potential future water source for the City of Portland, and that "the existing management of the upper Little Sandy area will permit an alternate water system to be

developed."[3] *Id.*, at 751 n. 3. Specific recommendations regarding mitigation measures that should be employed with any timber harvest are also included in the record. *Id.*, at 767–770.

Based on the foregoing, I find that plaintiffs have failed to raise genuine issues of material fact on the issue of the Forest Service's compliance with the BRMA either independently, or through NEPA or the APA. Further, I find that additional discovery will not cure the defect. Accordingly, defendants' motion for summary judgment is granted as to Claims 1 through 7.[4]

### 2. *Fragmentation in Violation of § 318*

Plaintiffs allege that the proposed sale fragments an ecologically significant old growth stand and that defendants violated § 318(a)(1) and APA, 5 U.S.C. §§ 702 and 706(2)(A) & (D), by failing to provide a complete array of 1990 sales to the Citizens Advisory Board in a timely and meaningful manner.[5] Amended Complaint, Claim 8, 9, and 18.

Section 318 of the Department of Interior and Related Appropriations Act for 1990 provides that the Forest Service "shall offer" 7,700,000,000 board feet of merchantable timber from the national forests of Oregon and Washington for fiscal years 1989 and 1990, and 5,800,000,000 board feet from Oregon and Washington National forest known to contain northern spotted owls. Fragmentation of forest land is addressed in the two subsections that follow:

"(b)(1): All timber sales from the thirteen National Forests in Oregon and Washington known to contain northern spotted owls prepared or offered pursuant to this section *shall minimize frag-*

*mentation of the most ecologically significant old growth stands.*

(b)(2): To the extent that fragmentation of the ecologically significant old growth stands is necessary to meet the timber sale level directed by § 318(s), the Forest Service *shall minimize such fragmentation in the ecologically significant old growth stands on a national forest by national forest basis based on the Forest Service's discretion* in determining the ecologically significant old growth stands after considering input from the advisory boards."

(emphasis added).

■ Both parties agree that review of the agency's action is controlled by the "arbitrary and capricious" standard of 5 U.S.C. § 706(2)(A). *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). In applying this test, I am to make a "searching and careful" inquiry and must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*, 109 S.Ct. at 1861. However, I may not substitute my own judgment for that of the agency. *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987). Finally, judicial review of an agency action is generally limited to review of the administrative record. *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988) *amended* 867 F.2d 1244 (9th Cir.1989). Courts may expand their review beyond the record and permit discovery if the agency failed to explain its action, or relied upon documents or materials not in the record so as to effectively frustrate judicial review. *Id.*

■ Based upon my review of the plain language of the statute, I find that § 318

---

**3.** The EA also notes that "[d]eveloping the alternate water system is the responsibility of the City of Portland and is not within the jurisdiction of the USDA Forest Service."

**4.** Because I find that plaintiffs' claims may be disposed of in light of the administrative record, I need not reach defendants' alternative argument that plaintiffs' claims are barred by the APA's six year statute of limitations applicable to actions against the United States under 28

U.S.C. § 2401(a) or intervenor Brazier's argument that plaintiffs' claims are barred by the doctrine of laches.

**5.** "Fragmentation" is the process of breaking up contiguous stands of old-growth forests into smaller and smaller patches, such that the interior habitat of the residual patches is eliminated and the distance between old-growth stands increases. AR, Part III, p. 1179.

does not require that defendants provide "a complete array of 1990 sales" to the Citizens' Advisory Board. Section 318 merely requires the Forest Service to consider fragmentation and make affirmative efforts to minimize fragmentation.

Again, even if defendants were held to the standard urged by plaintiffs, my review of the Administrative Record reveals that fragmentation was considered by the Forest Service and discussed at length with the Citizen Advisory Board in the Spring of 1990. *See* AR, Part III, p. 1056 (presentation of fragmentation "overview" by Tom Hussey); pp. 1096–1116 (transcript of 1/24/90 Citizen Advisory Board Agenda with discussion of fragmentation map and description of individual unit sales). In December of 1989, a fragmentation model was developed by the Mt. Hood National Forest. *Id.*, at p. 1179. In February of 1990, biologists prepared a forest wide ranking of timber sales within the Mt. Hood Forest considering both owl dispersal and forest fragmentation. *Id.*, at pp. 1280–1294. At page 1286 of the biologists' report, I note that in a comparison with over 20 other proposed sale units, the Quiver Area received one of the lowest overall ranking in terms of fragmentation "cost."

Based upon the foregoing, I find that plaintiff has failed to identify any genuine issues of material fact which require further supplementation of the Administrative Record or further discovery. In addition, based upon my review of the Administrative Record, I find that the Forest Service carefully and thoroughly considered the issue of fragmentation and that its decision to proceed with the Quiver Area Sale was neither arbitrary nor capricious.

### 3. *NEPA Violations*

■ Plaintiffs allege that defendants violated the APA by failing to disclose all environmental impacts as required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(C)(i), *et seq.*[6]

Specifically, plaintiffs contend that defendants failed to adequately analyze cumulative effects of blowdown on the adjacent ridgeline and potential impacts on fish and northern spotted owl habitat. Amended Complaint, Claim 10. In response to the government's motion for summary judgment, plaintiffs offer the affidavits of Mark Wigg, a forester, and James Little, a meteorologist, who have determined that any blowdown effects will be caused by winds from the south or southeast, and thus, the forest service's determination of prevailing northeasterly winds is insupportable.

The Quiver Timber Sale EA was tiered to the Bull Run Planning Unit Final Environmental Statement of 1978, the Bull Run Watershed Management Unit Land Management Plan of 1979 and the Mt. Hood National Forest Timber Management Plan of 1978. AR, Part I, pp. 3–377; AR Part II, pp. 395–472. As noted in my previous discussion of § 318, defendants' conduct is to be examined under the "arbitrary and capricious" standard mandated by the APA. *Marsh*, 109 S.Ct. at 1860.

As to plaintiffs' contention regarding an erroneous factual determination of wind direction, the EA and Analysis File recognize that blowdown is a possibility within the Bull Run Watershed, that winds are from the southwest and from the east, and that the risk of catastrophic blowdown is low. *See* AR, Part III, p. 775 (recognizing severe blowdown events in the Watershed, that Quiver has had "small patches" of blowdown and that alternatives not selected have higher blowdown potential); p. 783 (comparison chart reflects "low" blowdown potential for alternative selected); p. 858 (recognition of potential blowdown effect on Watershed); p. 859 (recognition of southwest winds and determination that probability of catastrophic windthrow is "low"). Based on the foregoing, I find that the record amply demonstrates that defen-

---

**6.** It is important to note that many of the standards cited by plaintiffs such as whether the agency has taken a "hard look" at potential impacts, and whether it has supplied convincing statements of reasons, are inapplicable to several claims in this case. These standards, cited from *Save the Yaak Committee v. Block*, 840 F.2d 714 (9th Cir.1988), relate to review of an administrative decision not to prepare an EIS based upon a finding of "no significant impact."

dants did not rely upon an erroneous wind direction in formulating their conclusion that the potential effects of blowdown upon the Watershed were "low," and preferable to proposed alternatives.

Plaintiffs' second claim under NEPA is that defendants failed to disclose "significant new information" contained in the Interagency Scientific Committee report entitled "A Conservation Strategy for the Northern Spotted Owl," also known as the "Jack Ward Thomas Report," as required by NEPA, 42 U.S.C. § 4332(C)(i). Amended Complaint, Claim 14.

The 427 page Conservation Report was prepared by a team of 17 scientists led by Jack Ward Thomas and known as the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl or ISC. The ISC was established under the authority of an agreement in August of 1988 between the National Park Service, the Forest Service, the Bureau of Land Management (BLM), and the Fish and Wildlife Service to develop a scientifically credible conservation strategy for the northern spotted owl. The ISC released its report in April, 1990 which sought a compromise that would allow continuation of some cutting of mature and old-growth forests, with a loss of up to half of the region's spotted owl population, and a logging ban on 30–40 percent of public timberland in the Northwest. Following additional scrutiny by a "Team II" scientific task force, Congress reduced the agency's timber production target from 3.85 billion board feet in fiscal 1990 to 3 billion in fiscal 1991. The Bureau of Land Management agreed to reduce its 1991 yearly cut in Oregon from 990 million to 750 million board feet. On September 25, 1990, Cy Jamison, Director of the BLM announced that for fiscal 1991 and 1992 the BLM would follow the conservation strategy of the ISC and would avoid all timber harvesting within 749,000 acres of BLM land designated as habitat conservation areas in the report of the ISC. See *Portland Audubon Society, Headwaters v. Lujan*, Civ. No. 87–1160–FR, 1991 WL 81838 (D.Or. filed May 8, 1991) (Judge Frye's Findings of Fact regarding ISC report).

Although NEPA does not specify when a supplement to an EIS must be filed, the Council on Environmental Quality Regulations which administers NEPA provides that agencies "shall prepare supplements to drafts or final environmental impact statements if ... there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1990). Plaintiffs do not contend that any modifications need to be made in the sale as a result of the report, but rely solely upon the theory that the agency should not have taken any actions prior to consideration of the report.

Where the question presented involves an examination of highly specialized or scientific information requiring a "high level of technical expertise," administrative law directs that I defer to "the informed discretion of the responsible federal agencies." *Marsh*, 109 S.Ct. at 1861. A determination of whether the agency's decision regarding the significance or applicability of the Thomas Report to 1990 sales was "arbitrary or capricious" is a factual one. *Id.* Here, because the agency decided not to issue a supplemental EIS, the court's role is to ensure that the agency took a "hard look" at the environmental consequences of its decision by setting forth a reasoned explanation. *Marble Mountain Audubon Soc. v. Rice*, 914 F.2d 179, 182 (9th Cir. 1990).

Plaintiffs concededly cannot point to anything within the Thomas report which provides any specific information concerning the northern spotted owl in relation to the Quiver Timber Sale. Further, plaintiffs can point to no specific provision in the Thomas Report which in any way supplements or modifies the factual findings made by defendants regarding the impact of the 1990 Quiver Sale on the northern spotted owl. Finally, plaintiffs can point to no new *scientific* data within the Thomas report which could constitute "significant" new information which would require defendants to submit a supplemental EIS for proposed 1990 sales. Based upon my review of the impact of the Thomas Report, I

find that its significance is to the overall policies and strategies for timber sales in 1991 and beyond and that it was not intended to affect 1990 sales.

In addition, a review of the Administrative Record reveals that the Forest Service was not only cognizant of the need to factor owl protection into their analysis, but took significant steps to review the potential impacts on owl habitat. *See generally,* Final Supplement to the EIS for an Amendment to the Pacific NW Regional guide, Vol. I, Spotted Owl Guidelines, AR, Part IV (reflecting defendants' consideration of alternative owl protection measures). *See also* AR, Part III, p. 1230 (biological opinion recognizes potential threat sales pose to owls and recommends protective measures for all 709 proposed sales under § 318); *Id.,* at pp. 1250–1255 (recommended protection measures including maintenance of habitat for owl pairs, avoidance of nest sites).

Based on the foregoing, I find that defendants have set forth a reasoned explanation for their decisions and that plaintiffs' claims under NEPA fail to raise genuine issues of material fact. Accordingly, defendants are entitled to summary judgment against plaintiffs' tenth and fourteenth claims.

### 4. *Endangered Species Act*

■ Plaintiffs allege that defendants violated the APA by failing to document conferencing with the Secretary of the Interior concerning a species listed as threatened under the Endangered Species Act (ESA). Amended Complaint, Claims 11 & 14. Plaintiffs concede that they have not met the 60–day notice requirement of the ESA, 16 U.S.C. 1540(g), but argue that the court may equitably waive this requirement under the ESA savings clause, 16 U.S.C. § 1540(g)(5) or by finding that the claims arise under the APA, rather than the ESA.

Plaintiffs' eleventh and fourteenth claims, although described as an action under both the ESA and APA, allege violations of the ESA. The Ninth Circuit has held that the notice requirement under the ESA is jurisdictional, not procedural and thus, I lack jurisdiction to reach this claim. *Save the Yaak v. Block,* 840 F.2d 714, 721 (9th Cir.1988); and *Hallstrom v. Tillamook County,* 844 F.2d 598 (9th Cir.1987) *aff'd,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). Further, I find that plaintiffs may not circumvent the notice requirement of the ESA by merely re-styling their claims to fit within the APA.

### 5. *Migratory Bird Treaty Act (MBTA)*

■ Plaintiffs allege that defendants have violated the MBTA because the proposed Quiver Timber Sale will diminish the habitat of the Northern Spotted Owl.[7] Amended Complaint, Claim 12.

The MBTA was first enacted in 1900 and was designed to authorize the Secretary of the Interior to "adopt such measures as may be necessary ... to aid in the restoration of such birds ... and to collect and publish useful information as to the propagation, uses and preservation of such birds." 16 U.S.C. § 701.[8] Section 703 of Title 16 provides that it shall be unlawful to "pursue, hunt, take, capture, kill ... possess, offer for sale ... any migratory bird." The northern spotted owl is a migratory bird as defined by the regulations. 50 C.F.R. § 10.13. Section 707 provides for criminal violations of up to $2,000 or imprisonment for up to two years for any violation of the subchapter. The fundamental purpose of this act is to protect migratory birds "from destruction in an unequal contest between hunter and bird," and to provide severe penalties for market hunters who receive commercial benefit from the sale of migratory bird parts. *See United States v. St. Pierre,* 578 F.Supp.

---

7. Although plaintiffs also allege that defendants' violation of the MBTA resulted in violations of the APA, 5 U.S.C. § 706, they fail to identify any procedural violations. Thus, as with their claims under the ESA, I consider Claim 12 solely insofar as it relates to the MBTA.

8. Neither party raises the issue, but to the extent that plaintiffs may allege *procedural* violations, I question whether a claim may be asserted against the U.S. Forest Service for violation of an Act directed to the activities of the Department of the Interior.

1424 (D.C.S.D.1983); and *United States v. Olson,* 41 F.Supp. 433 (D.C.Ky.1941).

Plaintiffs attempt to expand the MBTA's definition of a "taking" by reference to the ESA definition of a "taking" which includes both "harassment" and "harm." *See* 16 U.S.C. 1532(19). Identical attempts to expand the definition of a "taking" under the MBTA to include Forest Service activity have been rejected by at least two other district courts. *See Headwaters,* 1991 WL 81838, *7; and *Seattle Audubon Soc'y v. Robertson,* No. C89–160–WD, 1991 WL 180099 (W.D.Wash. March 7, 1991) (court found MBTA was not intended to include habitat modification).

In light of the Act's stated goal and overall purposes, I find that the proposed timber sale does not constitute a "taking" of migratory birds within the meaning of the MBTA.[9] I further find that the Act was intended to apply to individual hunters and poachers, and adopt the reasoning of Judges Frye and Dwyer that a "taking" under the MBTA does not include habitat modification resulting from Forest Service sales activity.

### 6. *APA: State Water Quality Standards*

Plaintiffs contend that defendants violated the APA, 5 U.S.C. § 706 by offering the Quiver Timber sale without assurances that state water quality standards will be met. Amended Complaint, Claim 13.

Defendants contend that this court lacks jurisdiction over a claim involving state water quality standards. In addition, defendants contend that they have offered ample assurances that state water quality standards will be met.

The Ninth Circuit has recognized that private citizens may invoke the judicial review provision of the APA for alleged state water quality control violations. *See Marble Mountain,* 914 F.2d at 183. Therefore, for the purposes of this motion, I am assuming that this court has jurisdiction over plaintiffs' claim.

Defendants' second contention, regarding compliance with state water quality standards, is fully supported in the Administrative Record. As discussed previously in Section 1 of this opinion, specific mitigation measures were adopted and a monitoring plan was developed to protect water quality standards. *See e.g.* AR III, pp. 739, 756–797, and 1275; and AR V, pp. 2039, *et seq.*

### 7. *The Mediated Agreement*

■ Finally, plaintiffs contend that defendants violated NEPA and the APA by failing to adequately analyze and disclose a prevention strategy for unwanted vegetation as required by a stipulated order entered into to resolve *Northwest Coalition for Alternatives to Pesticide, et al. v. Lyng,* Civ. No. 83–6272–E–BU (D.Or.1984). Amended Complaint, Claims 15–17. Plaintiffs concede that they are not parties to the agreement, but argue that the mediated agreement has been adopted by the Forest Service as an agency regulation or interpretive rule.

Pursuant to paragraph 5 of the Stipulated Order, settlement of the claims in the action in *Lyng* is only enforceable by the parties to that action. *See* Stipulated Order p. 10:

"As to third parties, the failure of the agency to adhere to any terms contained in Exhibit A shall not give rise to a course of action independent of applicable statute, rule, regulation or any other legally cognizable interest."

In order to establish federal standing, plaintiffs must first meet the requirements of Article III of the Constitution by alleging a "present or immediate injury in fact, where the party requesting standing has alleged such a personal stake in the outcome of the controversy as to assure concrete adverseness." *Phillips Petroleum Co. v. Shutte,* 472 U.S. 797, 804, 105 S.Ct. 2965, 2970, 86 L.Ed.2d 628 (1985). Thus, because plaintiffs seek declaratory relief relating to an agreement to which they are not parties, they must demonstrate that the

---

**9.** I also note that, although two spotted owls have been seen passing through the area, no spotted owls reside within the Quiver Project Area. AR, part III, pp. 799, 804–905.

alleged injury poses more than a remote or speculative threat to their interests as well as demonstrating a personal stake in the outcome. *See Id.* at 804, 105 S.Ct. at 2970 (litigant must normally assert his own legal interest rather than those of third parties).

For the purposes of this motion, I will assume that plaintiffs have a general interest in the vegetative management policies of the Forest Service insofar as they relate to the Quiver area. However, plaintiffs have failed to identify how an alleged violation of the mediated agreement affects interests which are not already adequately protected by the APA. The administrative Record reveals that the agency has addressed strategy regarding noxious weeds and the use of herbicides and has decided that no herbicides are to be used on the project. *See* AR, Part III, pp. 740, 748, 860–874. The vegetation management analysis reflects that the public was afforded full participation and opportunity for comment.[10]

Based on the foregoing, I find that plaintiffs lack standing to challenge a provision of the Mediated Agreement and further, that the Forest Service complied with its statutory duties to consider vegetation management. Accordingly, defendants' motion for summary judgment is granted as to plaintiffs' fifteenth and seventeenth claims.[11]

## CONCLUSION

Based on the foregoing, I find that no genuine issues of material fact exist as to any of plaintiffs' claims, 1 through 18. Accordingly, defendants' motion for summary judgment is granted; plaintiffs' cross-motion for partial summary judgment is denied; and intervenor-defendant's motion for summary judgment and NCAP's motion

---

to intervene and to join an additional defendant are moot.

---

**10.** In light of the documentation in the Administrative Record of full compliance with the APA regarding vegetation management in the Quiver Area, I find that Judge Hogan's recent decision in *ONRC v. Devlin, et al.,* Civ. No. 90–6391–HO (filed June 6, 1991) in which he granted an injunction based upon the Forest Service's failure to examine or discuss vegetation manage-

ment strategy in the North Umpqua Ranger District, is distinguishable.

**11.** In light of my ruling that plaintiffs lack standing to enforce the provisions of the mediated agreement, the motion of proposed plaintiff-intervenor Northwest Coalition for Alternatives to Pesticides (NCAP) to intervene as of right and to join an additional defendant is moot.