UNITED STATES of America,
Plaintiff,

v.

BRIGHAM OIL AND GAS,
L.P., Defendant.

United States of America, Plaintiff,

v.

Newfield Production Company,
Defendant.

United States of America, Plaintiff,

v.

Continental Resources, Inc., Defendant.

Case Nos. 4:11–po–005, 4:11–po–009, 4:11–po–004.

United States District Court,
D. North Dakota,
Northwestern Division.

Jan. 17, 2012.

Cameron W. Hayden, U.S. Attorney's Office, Bismarck, ND, for Plaintiff.

John C. Martin, Crowell & Moring, Washington, DC, John D. Russell, Fellers Snider Blankenship Bailey & Tippens PC, Tulsa, OK, Richard H. Kyle, Jr., Fredrikson & Byron, PA, Minneapolis, MN, Thomas A. Dickson, Dickson Law Office, Bismarck, ND, Lawrence Bender, Fredrikson & Byron, PA, Bismarck, ND, for Continental Resources Inc.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

DANIEL L. HOVLAND, District Judge.

Before the Court are the Defendants' Motions to Dismiss filed on October 25, 2011. *See* Docket Nos. 16, 18, and 20. For the reasons set forth below, the Court **GRANTS** the motions.

The Government initially charged seven oil and gas companies operating in North Dakota's Williston Basin with violating the Migratory Bird Treaty Act ("Migratory Bird Act" or "the Act"), 16 U.S.C. §§ 703 and 707(a). The charges are Class B misdemeanors. Defendant Brigham Oil & Gas, L.P. ("Brigham Oil") is charged with "taking" (killing) two migratory birds found dead near one of its reserve pits. Defendant Newfield Production Company ("Newfield Production") is charged with "taking" four migratory birds found dead on property located adjacent to one of its reserve pits. Defendant Continental Resources, Inc. ("Continental Resources"), is charged with "taking" one migratory bird found dead near one of its reserve pits. Three other defendants are also accused of "taking" migratory birds found dead near their respective reserve pits. These defendants entered into binding plea agreements with the Government which remain pending before the Court. The case against one other defendant was dismissed by the Government.

## I. *BACKGROUND OF THE CASE.*

### A. *The Government's Case Against Brigham Oil & Gas, L.P.*

Brigham Oil & Gas, L.P. was founded in 1992 and conducts oil and gas exploration activities in the region of the Bakken Shale

formation in the Williston Basin, among other areas. Brigham Oil operates in the State of North Dakota and is licensed by the North Dakota Secretary of State under ID No. 21902400. *See* Statement of Probable Cause, Case No. 4:11–po–005, Docket No. 4, p. 5, ¶ 1. One of Brigham Oil's development sites is known as "Lippert 1–12H No. 1–H" and is located in Williams County, North Dakota. *Id.* at p. 7, ¶ 6.

The allegations against Brigham Oil contained in the Information state the following:

> On or about May 6, 2011, in the District of North Dakota, Brigham Oil and Gas, L.P., without being permitted to do so by regulation as required by law, did take migratory birds, to wit, two Mallards, in violation of the Migratory Bird Treaty Act; In violation of Title 16, United States Code, Sections 703 and 707(a).

*See* Case No. 4:11–po–005, Docket No. 1. The Information does not contain an explanation of the phrase "without being permitted to do so by regulation as required by law." The Information does not explain the manner in which Brigham Oil allegedly "took" the birds.

On the same day it filed the Information against Brigham Oil, the Government filed a request for summons and the issuance of an arrest warrant, which was supported by a written affidavit. *See* Case No. 4:11–po–005, Docket Nos. 2, 2–1. On August 10, 2010, Magistrate Judge Charles S. Miller, Jr. denied the Government's request based on insufficient showings of probable cause with respect to the circumstances and cause of the birds' death. *See* Docket No. 3, pp. 3–5. In that Order, Judge Miller raised another issue: whether "migratory bird kills resulting from lawful commercial activity that is unrelated to hunting or poaching constitutes a crime under the Migratory Bird Act." *Id.*

On August 19, 2011, the Government filed a second Affidavit for Issuance of Arrest Warrant or Summons which consisted of a Statement of Probable Cause by Richard A. Grosz, Special Agent for the United States Fish & Wildlife Service. *See* Docket No. 4. This signed declaration provides a more detailed summary of the allegations against Brigham Oil. According to Special Agent Grosz, Brigham Oil kept an oil reserve pit on a site referred to as "Lippert 1–12H No. 1–H." *See* Docket No. 4, p. 7, ¶ 6. The contents of any reserve pit, as alleged in the declaration, can vary depending on "the type of drilling mud used, the formation drilled, and other chemicals added to the well bore during the drilling process." *See* Docket No. 4, p. 2. Special Agent Grosz's Statement contains a list of approximately 18 chemicals, minerals or other substances that might be found in reserve pits. *See* Docket No. 4, pp. 2–3. It also lists seven ways in which birds could be exposed to these harmful chemicals. *See* Docket No. 4, pp. 3–4. The declaration does not specify what particular chemicals or substances, if any, were found in Brigham Oil's reserve pit.

North Dakota state law defines a reserve pit and sets forth the requirements for how and when a reserve pit is to be cleaned up or "reclaimed." According to North Dakota state law, a "reserve pit" is "an excavated area used to contain drill cuttings accumulated during oil and gas drilling operations and mud-laden oil and gas drilling fluids used to confine oil, gas, or water to its native strata during the drilling of an oil and gas well." N.D.C.C. § 38–08–02. Reserve pits must be reclaimed within a reasonable time, not to exceed one year, after completion of a well. N.D.A.C. § 43–02–03–19. A reserve pit is not required to be fenced, screened, or netted "unless such pit is not reclaimed in excess of ninety days after completion of

the operation." N.D.A.C. § 43–02–03–19.1.

On May 6, 2011, Special Agent Grosz and Service Contaminants Specialist Micah Reuber inspected the Lippert site. *See* Docket No. 4, p. 7, ¶ 6. Special Agent Grosz inspected the pit and noted it was not netted or flagged at the time of inspection. *Id.* ¶ 8. He noticed an oil sheen "on the fluid of the reserve pit." *Id.* During the inspection, Special Agent Grosz observed and collected "two dead and oiled mallards." *Id.* Drilling began at the Lippert site on June 20, 2010, and was completed on November 14, 2010. *See* Docket No. 4, p. 7, ¶ 7. With regard to the cause of death, Special Agent Grosz states: "It reasonably appeared the two mallards died as a result of exposure to the contents of the oil pit." *Id.* ¶ 8. The statement contains no allegations regarding when the birds may have died and whether the pit was netted or flagged at the time.

### B. *The Government's Case Against Newfield Production Company.*

Newfield Production Company also develops oil and gas properties in the region of the Bakken Shale formation in the Williston Basin. Newfield Production operates in the State of North Dakota and is licensed by the North Dakota Secretary of State under ID No. 21902400. *See* Case No. 4:11–po–009, Docket No. 2–1, p. 6. One of Newfield Production's development sites is known as "Manolo 21–16–1H" and is located in Williams County, North Dakota. *Id.* at. p. 8, ¶ 9.

The Newfield Production Information is virtually identical to the Brigham Oil Information, except the date of the charged offense is May 18–19, 2011, and the list of birds includes two mallards, one northern pintail and one ring-necked duck. The Information states the following:

> Between on or about May 18, 2011 and May 19, 2011, in the District of North Dakota, Newfield Production Company, without being permitted to do so by regulation as required by law, did take migratory birds, to wit: two Mallards, one Northern Pintail, and one Red–Necked Duck, in violation of the Migratory Bird Treaty Act; In violation of Title 16, United States Code, Sections 703 and 707(a).

*See* Docket No. 1. The Information does not contain an explanation of the phrase "without being permitted to do so by regulation as required by law." The Information does not explain the manner in which Newfield Production allegedly "took" the birds.

On August 19, 2011, the Government also filed an Affidavit for Issuance of Arrest Warrant or Summons in the Newfield Production case, which consisted of a Statement of Probable Cause ("Statement") by Special Agent Grosz. *See* Docket No. 2–1. This signed declaration provides a more detailed summary of the allegations against Newfield Production. On May 18, 2011, the U.S. Fish & Wildlife Service received notice that fluid from the Manolo reserve pit overflowed the pit boundary, flowed into a coulee and then into some wetland on a private property. *See* Docket No. 2–1, p. 8, ¶ 6. According to Special Agent Grosz's declaration, an inspector from the North Dakota Department of Health found two dead ducks along the edge of the impacted wetland. *See* Docket No. 2–1, p. 8, ¶ 7. Fisheries Biologist Fred Ryckman found a third "dead and oiled" duck along the same wetland edge. Docket No. 2–1, p. 8, ¶ 8. Special Agent Grosz found another "dead and oiled" bird approximately 100 yards from the wetland edge. Docket No. 2–1, p. 8, ¶ 9. Based upon his experience and education, Special Agent Grosz states that "it reasonably appeared the two dead mallards, one dead pintail, and one dead ring-tailed duck died as a result of exposure to

the oil [sic] which spilled from the oil reserve pit." Docket No. 2–1, pp. 8–9, ¶ 12.

Drilling began at the Manolo site on September 18, 2010 and was completed on February 14, 2011. *See* Docket No. 2–1, p. 8, ¶ 11. The Statement of Probable Cause does not indicate whether the Manolo reserve pit was netted, screened or fenced at the time the dead birds were found. The statement also does not reveal whether netting would have prevented birds from being exposed to oily substances that overflowed the pit boundary in a time of spring flooding.

## C. *The Government's Case Against Continental Resources, Inc.*

Continental Resources, Inc. identifies and develops oil and gas properties in the Williston Basin. *See* Statement of Probable Case, Case No. 4:11–po–004, Docket No. 1–1. Continental Resources' principle place of business is located in Oklahoma, but operates in the State of North Dakota and is licensed by the North Dakota Secretary of State under the identification number 5782500. *Id.* One of the oil and gas properties developed by Continental Resources is known as the "Lokken 2–2H", located in Williams County. *Id.* Docket No. 1–1, p. 2, ¶ 6.

In an Information filed on August 2, 2011, the Government alleges that Continental Resources did take one migratory bird, a say's phoebe, in violation of the Migratory Bird Treaty Act. *See* Case No. 4:11–po–004, Docket No. 1. The Information states:

> On or about May 6, 2011, in the District of North Dakota, Continental Resources, Inc., without being permitted to do so by regulation as required by law, did take a migratory bird, to wit, one Say's Phoebe, in violation of the Migratory Bird Treaty Act; In violation of Title 16, United States Code, Sections 703–707(a).

*See* Docket No. 1. The Information omits an explanation of the phrase "without being permitted to do so by regulation by law" and fails to describe how Continental Resources committed the take.

On the same day it filed the Information against Continental Resources, the Government filed a request for summons and the issuance of an arrest warrant, which was supported by a written affidavit. *See* Case No. 4:11–po–004, Docket Nos. 2, 2–1. On August 10, 2010, Judge Miller denied the Government's request based on insufficient showings of probable cause with respect to the circumstances and cause of the birds' death. *See* Docket No. 3, pp. 3–5.

On August 19, 2011, the Government filed a second Affidavit for Issuance of Arrest Warrant or Summons which consisted of a Statement of Probable Cause by Richard A. Grosz, Special Agent for the U.S. Fish & Wildlife Service. *See* Docket No. 4. This signed declaration provides a more detailed summary of the allegations against Continental Resources. According to Special Agent Grosz, he found one dead migratory bird at an un-netted oil reserve pit at the Lokken 2–2H site. *See* Docket No. 4, p. 7, ¶ 6. Similar to the affidavit filed by the Government against Brigham Oil, the affidavit also explains that the contents of any reserve pit, as alleged in the declaration, can vary depending on the circumstances, but invariably contain potentially harmful chemicals. *See* Docket No. 4, pp. 2–4. The declaration does not specify what particular chemicals or substances, if any, were found in the reserve pit. The signed declaration also describes Continental Resources' past citations for violating the Migratory Bird Treaty Act in South Dakota, Montana, and North Dakota. *See* Docket No. 2–1, pp. 5–6.

## II. *LEGAL DISCUSSION.*

### A. *STANDARD OF REVIEW.*

■ The indictment or information must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R.Crim.P. 7(c)(1). If the government fails to plead conduct that is consistent with a violation of a criminal statute, the indictment or information is subject to dismissal for failure to state an offense. *United States v. Clark,* 646 F.2d 1259, 1261–62 (8th Cir.1981). Claims that a statute named in an indictment does not proscribe the alleged conduct are also treated as claims that the indictment "fails to state an offense." *See United States v. Adesida,* 129 F.3d 846, 850 (6th Cir.1997) ("If an indictment does not charge a cognizable federal offense, then a federal court lacks jurisdiction to try a defendant for violation of the offense.").

■ In the Eighth Circuit, an indictment or information is sufficient only if "it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Sewell,* 513 F.3d 820, 821 (8th Cir.2008). Thus, if the government fails to plead conduct that is a violation of a criminal statute, the indictment or information is subject to dismissal for failure to properly state an offense pursuant to Fed.R.Crim.P. 7(c)(1). *Clark,* 646 F.2d at 1261–62. "An indictment is normally sufficient if its language tracks the statutory language." *Sewell,* 513 F.3d at 822. However, if the Government has applied an erroneous interpretation to the statutory language to attempt to reach actions not prohibited by the statute, the indictment or information is subject to dismissal. *See United States v. Teh,* 535 F.3d 511, 515 (6th Cir.2008); *United States v.*

*Foley,* 73 F.3d 484, 488 (2d Cir.1996); *United States v. Meacham,* 626 F.2d 503, 509 (5th Cir.1980).

### B. *THE MIGRATORY BIRD TREATY ACT.*

The Migratory Bird Treaty Act is a criminal statute enacted by Congress in 1918. See 16 U.S.C. § 703. As amended, the Act provides in relevant part as follows:

**§ 703.** *Taking, killing, or possessing migratory birds unlawful*

(a) In general. Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936, the United States and the Government of Japan for the protection of migratory birds and birds in danger of extinction, and their environment concluded March 4, 1972 and the convention between the

United States and the Union of Soviet Socialist Republics for the conservation of migratory birds and their environments concluded November 19, 1976.

16 U.S.C. § 707 provides the criminal penalties at issue in this dispute.

### § 707. *Violations and penalties; forfeitures*

(a) Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $15,000 or be imprisoned not more than six months, or both.

(b) Whoever, in violation of this subchapter, shall knowingly—

(1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or

(2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be fined not more than $2,000 or imprisoned not more than two years, or both.

(c) Whoever violates section 704(b)(2) of this title shall be fined under Title 18, imprisoned not more than 1 year, or both.

(d) All guns, traps, nets and other equipment, vessels, vehicles, and other means of transportation used by any person when engaged in pursuing, hunting, taking, trapping, ensnaring, capturing, killing, or attempting to take, capture, or kill any migratory bird in violation of this subchapter with the intent to offer for sale, or sell, or offer for barter, or barter such bird in violation of this subchapter shall be forfeited to the United States and may be seized and held pending the prosecution of any person arrested for violating this subchapter and upon conviction for such violation, such forfeiture shall be adjudicated as a penalty in addition to any other provided for violation of this subchapter. Such forfeited property shall be disposed of and accounted for by, and under the authority of, the Secretary of the Interior.

■ The key statutory language is: "[I]t shall be unlawful at any time, by any means or in any manner, to . . . take . . . any migratory bird." In the context of the Act, "take" refers to conduct directed at birds, such as hunting and poaching, and not acts or omissions having merely the incidental or unintended effect of causing bird deaths.

■ When confronted with issues of statutory construction, courts begin by examining the plain language of the statute. *See United States v. Jeanpierre*, 636 F.3d 416, 425 (8th Cir.2011) (quoting *Jimenez v. Quarterman*, 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009)). To determine the plain meaning of a statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole, its object and policy. *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). The Migratory Bird Treaty Act does not define the term "take." In the absence of a statutory definition, courts construe a term according to its ordinary meaning. *See United States v. Parker*, 267 F.3d 839, 847 (8th Cir.2001), *cert. denied*, 535 U.S. 1011, 122 S.Ct. 1592, 152 L.Ed.2d 509 (2002). The ordinary meaning of the word "take," when applied to wildlife, denotes intentionally reducing the wildlife to possession. Webster's Third New International Dictionary defines "take" as "to get into one's hands or into one's possession, power, or control by force or stratagem: . . . to get possession

of (as fish or game) by killing or capturing...." *See Webster's Third New International Dictionary (Unabridged)* 2329–30 (1986); *see also Kepner v. United States,* 195 U.S. 100, 124, 24 S.Ct. 797, 49 L.Ed. 114 (1904) ("[L]anguage used in a statute which has a settled and well-known meaning ... is presumed to be used in that sense[.]"). This definition involves deliberate, not accidental, conduct. It refers to a purposeful attempt to possess wildlife through capture, not incidental or accidental taking through lawful commercial activity.

This definition comports with the definition of "take" that is found in the Migratory Bird Treaty Act's implementing regulations. According to 50 C.F.R. 10.12, "take" means "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." The use of these action words in the regulations reinforces the dictionary definition, and confirms that "take" does not refer to accidental activity or the unintended results of other conduct.

The Eighth Circuit Court of Appeals explored the meaning of the Migratory Bird Treaty Act in *Newton Cnty. Wildlife Ass'n v. U.S. Forest Serv.,* 113 F.3d 110 (8th Cir.1997). Newton County Wildlife Association brought an action against the Forest Service seeking to enjoin four timber sales because they allegedly violated the Migratory Bird Treaty Act (among other reasons). *Id.* at 112. The Wildlife Association argued that logging under the timber sales would disrupt nesting migratory birds, resulting in the death of at least some birds. *Id.* at 115. The district court denied injunctive relief. *Id.* at 110–11. The Eighth Circuit upheld the district court and found that timber harvesting that indirectly resulted in the death of migratory birds was not within the scope of activity covered by the Migratory Bird Treaty Act. *Id.* at 116.

In reaching this decision, the Eighth Circuit stated: "[I]t would stretch this 1918 statute far beyond the bounds of reason to construe it as an absolute criminal prohibition on conduct, such as timber harvesting, that indirectly results in the death of migratory birds." *Id.* at 115. The Eighth Circuit found that the ambiguous terms "take" and "kill" mean "physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918." *Id.* (internal quotations and citations omitted).

■ The Eighth Circuit's *Newton Cnty* opinion relied, in part, on the Ninth Circuit's opinion in *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297 (9th Cir.1991). In *Seattle Audubon,* the Ninth Circuit reviewed an appeal by two wildlife protection groups of the judgments of two district courts, both of which held that the Migratory Bird Treaty Act does not prohibit the Forest Service and the Bureau of Land Management from selling and logging timber from lands within areas that may provide suitable habitat for the northern spotted owl. *Id.* at 302. The appellants argued that timber sales that destroy owl habitat are tantamount to a proscribed "taking" under the Migratory Bird Treaty Act. *Id.* The court contrasted the definition of "take" under the Migratory Bird Treaty Act with the definition of "take" under the Endangered Species Act, which defines "take" broadly to include "harass" and "harm," in addition to the verbs included in the Migratory Bird Treaty Act definition. *Id.* at 303. The Ninth Circuit Court of Appeals found that the definition of "take" in the Migratory Bird Treaty Act was restricted to the sort of conduct engaged in by hunters and poachers. While acknowledging that some courts have held that the Migratory Bird Treaty Act reaches direct, though unintended, bird poison-

ing from toxic substances, the appellate court ruled that habitat destruction, leading indirectly to bird deaths, does not amount to a "taking" of a migratory bird within the meaning of the Migratory Bird Treaty Act. *Id.* at 303.

Other courts have recognized that lawful commercial activity, such as logging, that is unrelated to hunting or poaching and not directed at birds does not constitute a crime under the federal Migratory Bird Treaty Act. *See, Curry v. U.S. Forest Serv.,* 988 F.Supp. 541 (W.D.Pa.1997) (holding that Migratory Bird Treaty Act was not the proper statutory basis upon which to contest a Forest Service timber sale and concluding that the loss of migratory birds as a result of logging operations did not constitute a taking or killing prohibited by the Migratory Bird Treaty Act); *Mahler v. U.S. Forest Serv.,* 927 F.Supp. 1559 (S.D.Ind.1996) (declining to enjoin a proposed plan that complied with federal law, holding that indirect taking of migratory birds as a result of either habitat destruction or logging during nesting season did not fall within the Migratory Bird Treaty Act implementing regulations' definition of a "taking"); *Citizens Interested in Bull Run, Inc. v. Edrington,* 781 F.Supp. 1502 (D.Or.1991) (holding that diminishment of habitat for the northern spotted owl under a proposed National Forest timber sale would not result in a "taking" in violation of the Migratory Bird Treaty Act).

The District of New Mexico declined to apply the Migratory Bird Treaty Act to commercial activity in a case similar to the case at hand. In *United States v. Ray Westall Operating, Inc.,* the United States filed an information charging Westall Operating with violating the Migratory Bird Treaty Act. No. CR 05–1516–MV, 2009 U.S. Dist. LEXIS 130674, at *1 (D.N.M. Feb. 25, 2009). Westall Operating had several evaporation pits at its oil production site in Artesia. *Id.* at *3–4. Oil in the pit floats on the water surface and poses a danger to birds, including some species protected by the Migratory Bird Treaty Act. *Id.* The pit at issue in Westall Operating was approximately seven yards wide and thirty-one yards long, was entirely covered by netting made out of chicken wire to prevent birds from exposure to the oil hazard, and was surrounded by a barbed wire fence to keep out livestock. *Id.* The pits were inspected by Westall Operating employees every four to six weeks, by Federal Bureau of Land Management employees at approximately two month intervals, and by New Mexico Oil Conservation Division employees annually. *Id.* Sometime in late July or early August 2002, a switch malfunctioned and the overflow water began to accumulate in the evaporation pit. *Id.* The water in the pit rose to such a level that in some areas the oil pooled above the level of the sagging netting. *Id.* at *5. On August 15, 2002, fifty dead birds were discovered in the pit, both above the netting and beneath the netting; thirty-four birds belonged to species protected by the Migratory Bird Treaty Act. *Id.*

After determining that the Migratory Bird Treaty Act is ambiguous with respect to the meaning of the term "kill" and its application to bird deaths related to commercial activity, the district court looked at the history and policy behind the Migratory Bird Treaty Act. The district court concluded that "Congress intended to prohibit only conduct directed towards birds and did not intend to criminalize negligent acts or omissions that are not directed at birds, but which incidentally and proximately cause bird deaths." *Id.* at *19; *see United States v. Chevron USA, Inc.,* No. 09–CR–0132, 2009 WL 3645170 (W.D.La. Oct. 30, 2009) (rejecting plea agreement with respect to the death of 35 brown pelicans entrapped in an uncovered offshore oil well

caisson because the activity did not constitute a crime under the Migratory Bird Treaty Act).

Like the evaporation pit in *Westall Operating*, Brigham Oil and Gas, Newfield Production, and Continental Resources' reserve pits are not directed at birds or their habitat. The reserve pits are excavation areas used to contain drill cuttings and oil and gas fluids accumulated during commercial drilling operations. The reserve pits have little effect on bird habitat, except to attract occasional birds which mistake the pits for a pond or lake. In all of the cases before the Court the reserve pits were not created to effect the habitat of migratory birds.

The Court acknowledges that there are a few courts, outside of the Eighth Circuit Court of Appeals, which have applied the Migratory Bird Treaty Act to indirect, unintentional commercial activity. *See United States v. FMC Corp.*, 572 F.2d 902 (2d Cir.1978); *United States v. Corbin Farm Serv.*, 444 F.Supp. 510 (E.D.Cal.), *aff'd* on other grounds, 578 F.2d 259 (9th Cir.1978); *United States v. Moon Lake Elec., Ass'n, Inc.*, 45 F.Supp.2d 1070 (D.Colo.1999); *United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir.2010). However, none of these cases are controlling in the Eighth Circuit.

■ This Court expressly finds that the use of reserve pits in commercial oil development is legal, commercially-useful activity that stands outside the reach of the federal Migratory Bird Treaty Act. Like timber harvesting, oil development and production activities are not the sort of physical conduct engaged in by hunters and poachers, and such activities do not fall under the prohibitions of the Migratory Bird Treaty Act. The Eighth Circuit Court of Appeals' decision in *Newton Cnty* is controlling precedent which this Court is obligated to follow.

The Government's case is premised on an expansive interpretation of the Migratory Bird Treaty Act. The Government requests that the Court apply a broad interpretation of the words "take" and "kill" in the Migratory Bird Treaty Act to encompass not only physical activity directed against a bird, but also habitat modification and other impacts that arise from lawful commercial activity. The Eighth Circuit has held that such a broad interpretation "would stretch this 1918 statute far beyond the bounds of reason." *Newton Cnty.*, 113 F.3d at 115.

It is well-established that a court is required to construe a criminal statute narrowly. As the United States Supreme Court explained:

> Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.... This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*United States v. Santos*, 553 U.S. 507, 514, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008) (citations omitted).

If there is a desire on the part of Congress to criminalize commercial activity that incidentally injures migratory birds protected under the Migratory Bird Treaty Act, it may certainly do so-but the criminal laws should be clear and certain. If the Department of Justice desires to prosecute such commercial activity, it should lobby Congress to make the neces-

sary changes in the law. The current law, which was enacted by Congress in 1918, is vague and ambiguous as it relates to criminal sanctions for lawful, commercial activity that may indirectly injure or kill migratory birds. The Court finds that under the federal statute as it is currently written, the conduct of Brigham Oil and Gas, Newfield Production, and Continental Resources is insufficient as a matter of law to trigger criminal liability.

As previously noted, the critical issue regarding the scope of the Migratory Bird Treaty Act's prohibitions is whether to "take" or "kill" a migratory bird refers to and prohibits any activity that may proximately cause a bird death *or* whether it only covers conduct directed against wildlife. If the Migratory Bird Treaty Act concepts of "take" or "kill" were read to prohibit any conduct that proximately results in the death of a migratory bird, then many everyday activities become unlawful—and subject to criminal sanctions—when they cause the death of pigeons, starlings and other common birds. For example, ordinary land uses which may cause bird deaths include cutting brush and trees, and planting and harvesting crops. In addition, many ordinary activities such as driving a vehicle, owning a building with windows, or owning a cat, inevitably cause migratory bird deaths.

The terms "take" and "kill" as found in 16 U.S.C. § 703 of the Migratory Bird Treaty Act are action verbs that generally denote intentional behavior. Both "take" and "kill" appear in conjunction with acts that require behavior with a purpose, i.e., "to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase. . . ." 16 U.S.C. § 703. Like the common understanding of "hunt," "capture" or "attempt to take," the words "take" and "kill" mean an intentional act and do not suggest coverage of a lawful action that may result in the death of a bird. Further, the words of the regulation defining "take" at 50 C.F.R. § 10.12 ("pursue," "hunt," "capture," "sell," and "transport") clearly pertain to conduct directed against wildlife. Common sense indicates that "take" and "kill" should not be given a meaning significantly different from the terms accompanying those words.

More important, to extend the Migratory Bird Treaty Act to reach other activities that indirectly result in the deaths of covered birds would yield absurd results. The Migratory Bird Treaty Act covers "nearly all native birds in the country," including pigeons, sparrows and crows. *See* 50 C.F.R. § 10.13. There are approximately 836 species of birds protected under the Act. The U.S. Fish & Wildlife Service has said that birds face tremendous challenges to their survival every day, most of which are related to human activities. The U.S. Fish & Wildlife Service has published a summary of estimates of how many birds are killed each year by human-caused threats:

*Collisions.* Building window strikes may account for 97 to 976 million bird deaths each year. Communication towers conservatively kill 4 to 5 million birds annually (possibly closer to 40 to 50 million; a nationwide cumulative impacts study should help resolve the question). Strikes at high tension transmission and distribution power lines very conservatively kill tens of thousands of birds annually. Taking into account the millions of miles of bulk transmission and distribution lines in the U.S., and extrapolating from European studies, actual mortality could be as high as 174 million deaths annually. Electrocutions probably kill tens of thousands of birds but the problem is barely monitored. Cars may kill 60 million birds or more each year, private and commercial aircraft far

fewer, while wind turbine rotors kill an estimated 33,000 birds annually.

*Poisoning.* In one recent study, pesticides were estimated to result in the direct deaths of at least 72 million birds annually. This is an underestimate of the total deaths, given that delayed deaths from poisoned prey, orphaned chicks, and neurological problems were not included and the study site was limited. Oil spills may kill hundreds of thousands or more, depending on the severity and timing of the spill. Up to two million birds are killed annually in oil and wastewater pits, mainly in the western states.

*Cats.* Many citizens would be surprised to learn that domestic and feral cats may kill hundreds of millions of songbirds and other avian species each year. A recent study in Wisconsin estimated that in that state alone, domestic rural cats kill roughly 39 million birds annually. Add the deaths caused by feral cats, or domestic cats in urban and suburban areas, and this mortality figure would be much higher.

*By–Catch.* Tens to hundreds of thousands of seabirds are estimated to die in U.S. fisheries each year. Monitoring for this, however, is again very limited.

*See U.S. Fish & Wildlife Service, Migratory Bird Mortality, Many Human–Caused Threats Afflict our Bird Populations* at 2 (Jan.2002), *available at* http://www.fws. gov/birds/mortality-fact-sheet.pdf (hereinafter "Government's Migratory Bird Mortality Fact Sheet"). To be consistent, the Government would have to criminalize driving, construction, airplane flights, farming, electricity and wind turbines, which cause bird deaths, and many other everyday lawful activities. As one commentator noted,

> Extending the MBTA's reach beyond activity directed at wildlife would hamper normal land use activities that often result in bird death—such as farming, timber harvesting, and brush clearing.... No de minimis exception appears to apply, because the MBTA makes unlawful the taking of a single migratory bird.... When the MBTA is construed sensibly, as a whole and in light of legislative history, it can be read only to criminalize activity directed against migratory birds.

Benjamin Means, *Prohibiting Conduct, Not Consequences: The Limited Reach of the Migratory Bird Treaty Act,* 97 Mich. L.Rev. 823, 842 (1998). Just as in the case of driving, flying, or farming, the Migratory Bird Treaty Act cannot reasonably be read to criminalize the legal operation of a reserve pit at an oil exploration site.

In summary, the federal Migratory Bird Treaty Act, as broadly interpreted by the Government, offers unlimited potential for criminal prosecutions. The U.S. Fish & Wildlife Service has recognized countless numbers of ways in which otherwise lawful actions may result in the unintended death of migratory birds. Given the bird mortality figures compiled by the U.S. Fish & Wildlife Service, it would not be feasible to prosecute all or even most of those persons or entities who technically violate the Migratory Bird Treaty Act. All parties involved in this dispute have acted in good faith, and there is case law which supports the legal arguments both sides have presented. Nevertheless, the criminalization of lawful, commercial activity which may indirectly injure or kill migratory birds is not warranted under the Migratory Bird Treat Act as it is currently written.

This Court believes that it is highly unlikely that Congress ever intended to impose criminal liability on the acts or omissions of persons involved in lawful commercial activity which may indirectly cause the death of birds protected under the Migratory Bird Treaty Act. The rem-

edy for the death of migratory birds found in or near reserve pits in the oil fields of North Dakota is probably best left in the hands of the North Dakota Industrial Commission which can easily address the perceived problem in its administrative rules and regulations. These defendants are currently required under North Dakota law to construct a reserve pit at the well sites during drilling operations. To criminalize lawful commercial activity conducted in the oil fields of North Dakota, which may indirectly effect migratory birds, was never contemplated under the Migratory Bird Treaty Act enacted by Congress in 1918. The Eighth Circuit Court of Appeals said that to criminalize such activity stretches the 1918 federal law "far beyond the bounds of reason" and common sense. This Court agrees. The Court concludes, as a matter of law, that lawful commercial activity which may indirectly cause the death of migratory birds does not constitute a federal crime. The Defendants' Motions to Dismiss are **GRANTED.**

**IT IS SO ORDERED.**